Michael A. LEBRON, Plaintiff,

v.

The NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK) and Transportation Displays Incorporated, Defendants.

No. 92 Civ. 9411(PNL).

United States District Court,
S.D. New York.

Feb. 5, 1993.

As Amended Feb. 8, 1993.

---

Center for Constitutional Rights, Georgetown University Law Center, Washington, DC (David D. Cole, of counsel), Weil, Gotshal & Manges, New York City (R. Bruce Rich, Gloria C. Phares, Robin E. Silverman, Bernadette M. McCann Ezring, Jonathan Bloom, of counsel), for plaintiff.

Siff Rosen, P.C., New York City (Mark S. Landman, of counsel), National R.R. Passenger Corp., Washington, DC (Daniela Winkler, Richard G. Slattery, of counsel), for defendant Amtrak.

Kostelanetz Ritholz Tigue & Fink, New York City (Edward M. Spiro and David M. Kohane, of counsel), for defendant Transportation Displays Inc.

## OPINION AND ORDER

LEVAL, District Judge.

### Findings of Fact and Conclusions of Law

This is a so-called "Bivens" action,[1] brought under the First Amendment by an artist, Michael A. Lebron, would-be lessor of a gigantic billboard in New York's Pennsylvania Station. The primary defendant is Amtrak, the National Passenger Railroad Corporation, which, as owner of the billboard, rejected the two-month lease plaintiff had contracted for with Amtrak's leasing agent because plaintiff's display was "political." Plaintiff contends the rejection was inconsistent with the requirements of the First Amendment. He sues to invalidate the rejection so that he can obtain the benefit of his lease agreement.

As an alternative theory, plaintiff alleges that Amtrak and its leasing agent Transportation Displays Incorporated ("TDI"), the second defendant, are estopped by reason of delay from denying plaintiff's contract.

On the consent of the parties, trial was conducted on an expedited basis, upon written submissions. The court's findings of fact and conclusions of law are as follows.

### Background

Lebron is an artist who creates works for display on billboards. His works often involve commentary on public issues. *See, e.g., Lebron v. Washington Metropolitan Area Transit Authority,* 749 F.2d 893 (D.C.Cir.1984). During 1991 and 1992, he made plans for a photomontage for a particular billboard in Penn Station. The billboard is known as the Spectacular; it is a curved, back-lit display space approximately 103 feet wide and 10 feet high, covering the east-facing wall of the rotunda area, facing passengers (and others) who walk

---

1. *See Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

westward toward the waiting areas, ticket booths, and train platforms.

Defendant TDI is an advertising agency that handles the leasing of billboards for many of Amtrak's properties and for other billboard owners in the rail transportation system. Amtrak has authorized TDI to lease the billboards in Penn Station. While the licensing agreement reserves for Amtrak the right of approval of all advertising copy, in practice, Amtrak does not review advertising copy, excepting advertisements for the Spectacular.

In August 1991, Lebron first contacted TDI about contracting for billboard space in Penn Station. He spoke from time to time with William B. Schwartz, a TDI account executive. Schwartz told him that while no displays would be accepted that included obscenity or violence, there were no other policy restrictions on advertising.

The Spectacular was available for two months at the beginning of 1993. Lebron and TDI reached agreement on financial terms of $18,500 a month for January and February 1993. In August 1992, Schwartz gave Lebron the standard rental form contract, which Lebron signed and returned. During the negotiations, Schwartz asked Lebron what he would display on the billboard. Lebron responded that in general his work was political, although it often looked like advertising, but that he preferred to keep confidential the specific content of the work he was creating for the Spectacular. Schwartz did not suggest that the political nature of the work would be a problem.

On November 30, 1992, TDI signed the agreement. The terms of the contract included the following:

All advertising copy is subject to approval of TDI and the Transportation Facility concerned [i.e., the owner of the billboard] as to character, text, illustration, design and operation.

If for any cause beyond its control TDI shall cease to have the right to continue the advertising covered by this contract, or if the Transportation Facility concerned should deem such advertising objectionable for any reason, TDI shall

have the right to terminate the contract and discontinue the service without notice.

During the fall, Lebron worked on creation of his piece for the 10 × 103 foot space. On December 2, 1992, he provided TDI with a color photocopy of his piece. The work is a photomontage, accompanied by considerable text. Taking off on a widely circulated Coors beer advertisement which proclaims Coors to be the "Right Beer," Lebron's piece is captioned "Is it the Right's Beer Now?" It includes photographic images of convivial drinkers of Coors beer, juxtaposed with a Nicaraguan village scene in which peasants are menaced by a can of Coors that hurtles towards them, leaving behind a tail of fire, as if it were a missile. The accompanying text, appearing on either end of the montage, criticizes the Coors family for its support of right-wing causes, particularly the contras in Nicaragua. Again taking off on Coors' advertising which uses the slogan of "Silver Bullet" for its beer cans, the text proclaims that Coors is "The Silver Bullet that aims The Far Right's political agenda at the heart of America."

On December 7, TDI sent the work on to Amtrak for approval. Ten days later, Anthony DeAngelo, the Amtrak Vice President for Real Estate and Operations Development, the person authorized by Amtrak's Board of Directors to oversee third-party advertising located on Amtrak property, disapproved Lebron's work on the grounds that it was "political." Amtrak notified TDI of this decision on December 23 in a letter stating that "Amtrak's policy is that it will not allow political advertising on the [S]pectacular advertising sign." Lebron learned of Amtrak's rejection from TDI on December 29, 1992, three days before his advertisement was to appear in the Spectacular.

## Discussion

### A. Governmental Action

Lebron contends that in rejecting his work Amtrak engaged in censorship in violation of his free speech rights under the First Amendment. Alternatively put, he

contends that Amtrak's actions violated the requirements that the First Amendment imposes on governmental regulation of speech. The prohibitions of the First Amendment are "a restraint on government action, not that of private persons." *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 114, 93 S.Ct. 2080, 2092, 36 L.Ed.2d 772 (1973) (citing *Public Utilities Comm'n v. Pollak,* 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952)).

Amtrak claims it is a private entity, immune from the restrictions of the First Amendment and, to the contrary, guaranteed the right under the First Amendment to control speech on its billboards in whatever fashion it chooses. The first issue in contention thus turns on whether Amtrak should be deemed a governmental or a private actor for these purposes.

■ "Conduct that is formally 'private' may become ... so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." *Evans v. Newton,* 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966). The Supreme Court has outlined several ways through which the activities of a private entity can become governmental action. One such standard is relevant here.[2] Under this standard, known as the "symbiotic relationship" test, private activity becomes subject to the restrictions that the Constitution imposes on government when the government "has so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity." *Burton v. Wil-*

*mington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961); *accord Evans v. Newton,* 382 U.S. at 299, 86 S.Ct. at 488. There must be a "'sufficiently close nexus between the State and the challenged action ... so that the action of the [private actor] may be fairly treated as that of the State itself.'" *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982) (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974)). *See also Myron v. Consolidated Rail Corp.,* 752 F.2d 50, 54 (2d Cir.1985) (same standards applied in assessing "federal action" as for "state action") (citing cases). The symbiotic relationship test "focuses on the [government's] overall relationship with the private actor," *Hadges v. Yonkers Racing Corp.,* 918 F.2d 1079, 1082 (2d Cir.1990), and "does not require that the plaintiff demonstrate that the state was involved in the challenged conduct." *Stevens v. New York Racing Ass'n, Inc.,* 665 F.Supp. 164, 171 (E.D.N.Y. 1987).

The Supreme Court has consistently emphasized that the issue of state, or governmental, action turns on a factual inquiry specific to each situation. "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Authority,* 365 U.S. at 722, 81 S.Ct. at 860 (private restaurant, operated in space leased from city owned parking garage, that refused service to blacks, deemed governmental actor where revenues from discriminatory service ultimately financed the

---

**2.** The other two standards are the "public function" doctrine, *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 157, 98 S.Ct. 1729, 1734, 56 L.Ed.2d 185 (1978), and the "state compulsion" doctrine, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The latter is applicable when the government "has exercised coercive power or has provided ... significant encouragement, either overt or covert," to bring about the challenged action. *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982). The former doctrine holds government action may be present "if the private entity has exercised powers that are 'traditionally the exclusive prerogative of the State.'"

*Blum,* 457 U.S. at 1005, 102 S.Ct. at 2786 (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 353, 95 S.Ct. 449, 455, 42 L.Ed.2d 477 (1974)); *see also Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 160, 98 S.Ct. 1729, 1735, 56 L.Ed.2d 185 (1978). It is not enough that the government has authorized a private entity to perform a task; it must be a role traditionally performed by the state. *See Flagg Bros.,* 436 U.S. at 160–62, 98 S.Ct. at 1735–39; *Jackson,* 419 U.S. at 352–53, 95 S.Ct. at 454; *see also Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (company town with all the attributes of public town subject to constitutional limitations).

public parking facility); *see Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 614, 109 S.Ct. 1402, 1411, 103 L.Ed.2d 639 (1989) ("Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, a question that can only be resolved 'in light of all the circumstances.' ") (citations omitted); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939, 102 S.Ct. 2744, 2755, 73 L.Ed.2d 482 (1982) (determination "necessarily fact-bound"); *see also Rendell–Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982) (private remedial school held to be non-governmental, notwithstanding state regulation and funding, in a suit by discharged teachers).

██ I conclude, based on examination of the federal government's deep and controlling entwinement in Amtrak's structure and operations, that, when Amtrak undertakes to control the content of speech on its billboards, its conduct must be deemed governmental rather than private.

What is clear at a glance is that Amtrak does not comfortably fit the conventional mold of either private or governmental entity.

In form and name it resembles more closely a private entity. It is a for-profit business corporation and is decreed by act of Congress "not [to] be an agency, instrumentality, authority, or entity, or establishment of the United States Government." 45 U.S.C. § 541. Its common stock is owned by private railroad companies.

On the other hand, in both image and reality it is impregnated with governmental character and inseparably intertwined with governmental authority and financing. Looking first at the symbolic, Congress established Amtrak, 45 U.S.C. § 501, and defined it as a "mixed-ownership government corporation." 31 U.S.C. § 9101. It is defined in the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, as a "public entity." [3] 42 U.S.C. § 12131(1)(C).

More significant is the governmental penetration of Amtrak's operations. All of Amtrak's directors are appointed directly or indirectly by the President of the United States. 45 U.S.C. § 543. Of its nine board members, five are directly appointed by the President; [4] the sixth is the Secretary of Transportation sitting ex officio, who is also appointed directly by the President. Two board members are selected by the United States Government, as the owner of all of Amtrak's preferred stock. The final member of the board is the president of Amtrak, who is selected by the other directors. The parties agree that Amtrak's board is responsible for controlling Amtrak and would have the authority to approve or disapprove of Amtrak's advertising policies throughout its facilities. Indeed, the board has, by resolution, authorized Amtrak's current agreements with TDI concerning advertising.

The federal government is also deeply involved in the financing of Amtrak's operations. Every year, Congress appropriates the sum necessary to cover the shortfall of Amtrak's operating results. *See* 45 U.S.C. § 601.[5] For example, for the fiscal year ending September 30, 1993, Congress has

---

**3.** Amtrak is also subject to the Freedom of Information Act. 45 U.S.C. § 546(g).

**4.** One is selected from a list supplied by the Railway Labor Executives Association, one from among the governors of states with an interest in rail transportation, and one as a representative of business with an interest in rail transportation. 45 U.S.C. § 543(a)(1)(C). Two directors are selected from lists of names supplied by commuter authorities that work with Amtrak. § 543(a)(1)(D)(ii).

**5.** In fact, as the parties have agreed, in 1976, Amtrak's fiscal year end for accounting pur-

poses was changed from December 31 to September 30 "to coincide with the fiscal year adopted by the federal government and used in providing federal assistance to [Amtrak]."

Congress stated as a goal that Amtrak use its "best business judgment in taking actions to minimize Federal subsidies." 45 U.S.C. § 501a(1), and Congress encouraged Amtrak to "enter into agreements with the private sector and undertake initiatives which are consistent with good business judgment and designed to maximize its revenues and minimize Federal subsidies." 45 U.S.C. § 501a(14).

appropriated up to $846 million for Amtrak's operating losses, capital improvements, tax liability, and labor protection costs and for the Northeast Corridor Improvement Program. Pub.L. 102–388, 106 Stat. 1520 (Oct. 6, 1992). For this reason, Amtrak's revenues from the leasing of its billboard space are, in a sense, revenue of the federal government. Every dollar of net billboard revenue realized by Amtrak results in a one dollar reduction of the subsidy obligation of the federal government. Conversely, if Amtrak subsidized any exhibitor on its billboards by charging less than the market rate, the display would essentially be financed by the federal government.[6]

Amtrak has also been vested with various attributes of governmental character. For example, Congress has given Amtrak the power of eminent domain, 45 U.S.C. § 545(d), exemption from state and local taxes and fees, including all real estate taxes, 45 U.S.C. § 546(b), and various loan guarantees, 45 U.S.C. § 602, so that it borrows under the credit of the federal government. Amtrak is required to report annually to Congress on its operations. 45 U.S.C. § 548.

Finally, the federal government has invested billions of dollars in Amtrak's properties. Amtrak acquired its Northeast Cor-ridor properties, including Penn Station, by statutory condemnation paid for by the United States.[7] See Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 et seq. The federal government has also invested billions of dollars in the improvement of Amtrak's Northeast Corridor facilities. See 45 U.S.C. § 854 (authorizing up to $2.5 billion). While Amtrak owns the fee in Penn Station, the federal government holds a mortgage on it, and indeed on all the Northeast Corridor properties.[8]

Thus, when Amtrak undertakes to control the content of the messages on its billboards in Penn Station, these controls are exercised by a corporation whose directors are appointed by the President, whose operations are financed by the federal government, and whose properties, in major part, are mortgaged to the federal government.

Amtrak contends that it cannot be deemed a governmental actor. It first cites a range of cases which found in various contexts that Amtrak is not a government agency or entity. See, e.g., National R.R. Passenger Corp. v. Atchison, T. & S.F. Ry. Co., 470 U.S. 451, 454, 105 S.Ct. 1441, 1445, 84 L.Ed.2d 432 (1985); National R.R. Passenger Corp. v. Two Parcels of Land, 822 F.2d 1261, 1264 (2d Cir.), cert.

---

6. See Burton, 365 U.S. at 724, 81 S.Ct. at 861 (discriminatory practices of restaurant allegedly increased business and therefore benefitted the restaurant's landlord, the government, supporting finding of state action); Citizens to End Animal Suffering & Exploitation, Inc. v. Faneuil Hall Marketplace, Inc., 745 F.Supp. 65, 73 (D.Mass.1990) (state action finding supported by fact that success of private entity served financial interests of city in reviving urban area); Stevens v. New York Racing Ass'n. Inc., 665 F.Supp. at 172–75 (likelihood of state action where excess revenues of the non-profit association went to the state).

7. After much litigation and negotiation, the federal government, in 1981, paid Penn Central $2.113 billion as compensation for the Northeast Corridor properties, including Penn Station.

8. In addition, portions of Penn Station are used by other governmental entities under leases with Amtrak. For example, Amtrak leases significant portions of Penn Station to the Long Island Rail Road (LIRR) and New Jersey Transit (NJT), both public entities, for the operation of their respective rail passenger services. An array of leases and joint agreements among Amtrak, LIRR, and NJT govern the management of public areas of Penn Station and the funding of construction and maintenance of various train and tunnel facilities. Hence, portions of the station occupied by LIRR and NJT are subject to constitutional limitations, and these areas are largely contiguous with those controlled by Amtrak. Indeed, some facilities of LIRR and NJT, such as ticket and information booths, are in the midst of Amtrak's facilities on the same floor of Penn Station as the Spectacular. Notably, the public therefore has little way of knowing whether or not it is in an area where constitutional limitations apply. See Coleman v. Wagner College, 429 F.2d 1120, 1127 (2d Cir.1970) (Friendly, J., concurring) (suggesting that one rationale for holding of Burton is that when "citizens may reasonably believe [action] to have been taken at the state's instance, state action may legitimately be found even though the state left the private actors almost complete freedom of choice").

*denied,* 484 U.S. 954, 108 S.Ct. 347, 98 L.Ed.2d 373 (1987); *Ehm v. National R.R. Passenger Corp.,* 732 F.2d 1250, 1253–56 (5th Cir.), *cert. denied,* 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 322 (1984); *Kimbrough v. National R.R. Passenger Corp.,* 549 F.Supp. 169, 173 (M.D.Ala.1982); *Sentner v. Amtrak,* 540 F.Supp. 557 (D.N.J. 1982). These cases do not determine the question in this case. Plaintiff does not contend that Amtrak is a governmental agency. What plaintiff contends is that the federal government is sufficiently entwined in Amtrak's operations and authority that the particular actions at issue must be deemed governmental action.

Next Amtrak relies on a number of cases in which discharged employees charged either Amtrak or the similarly structured Consolidated Rail Corporation ("Conrail") with unconstitutional governmental action. In each of these cases, the courts held that Amtrak's (or Conrail's) actions in dealing with its employees were not deemed to be governmental action. *See, e.g., Myron v. Consolidated Rail Corp.,* 752 F.2d 50 (2d Cir.1985) (constitutional limitations do not apply to the activities of Conrail in discharging an individual employee); *Anderson v. National R.R. Passenger Corp.,* 754 F.2d 202, 204 (7th Cir.1984) (in challenge to employee termination, Amtrak not a state actor); *Andrews v. Consolidated Rail Corp.,* 831 F.2d 678 (7th Cir.1987) (Conrail not state actor in refusing to reinstate employee); *Morin v. Consolidated Rail Corp.,* 810 F.2d 720 (7th Cir.1987) (no state action in discharging employee); *Marcucci v. National R.R. Passenger Corp.,* 589 F.Supp. 725 (N.D.Ill.1984) (no state action in wrongful discharge suit); *Rost v. National R.R. Passenger Corp.,* 1989 WL 104809 (E.D.Pa. Sept. 11, 1989) ("no allegations concerning the nexus between the federal government and Amtrak's personnel practices."); *Hankin v. National R.R. Passenger Corp.,* 1987 WL 20136, 1987 U.S.Dist. LEXIS 10741 (N.D.Ill. Nov. 16, 1987) (following

*Anderson* ); *cf. Railway Labor Executives Ass'n v. National R.R. Passenger Corp.,* 691 F.Supp. 1516, 1524 n. 11 (D.D.C.1988) (drug testing by Amtrak not Fourth Amendment violation). Amtrak argues that these authorities conclusively determine for the present litigation that it is not a governmental actor.

The argument is unpersuasive. The fact that Amtrak is considered a private employer in administering its employment of personnel does not mean it will be deemed private when it regulates speech. Whether conduct of a particular entity will be deemed governmental action can vary with the type of action at issue.[9] As Judge Friendly explained in *Wahba v. New York University,* 492 F.2d 96, 100 (2d Cir.1974), "we do not find decisions dealing with one form of state involvement and a particular provision of the Bill of Rights at all determinative in passing upon claims concerning different forms of government involvement and other constitutional guarantees." *See also Weise v. Syracuse University,* 522 F.2d 397, 404 (2d Cir.1975). Indeed Amtrak conceded at oral argument that, if it restricted service to passengers on the basis of race, religion, or national origin, it would be deemed a governmental actor in that respect. *See Burton v. Wilmington Parking Authority, supra.*

In my view, the regulation of public speech through the use of the billboards in public train stations raises very different considerations from Amtrak's administration of its work force.

In actions based on an employer's dealings with employees, no particularly great significance attaches to whether the employer's actions are deemed to be private or governmental. There are no important policies of the Constitution that would be undermined by permitting an employer that is entwined with government to deal with employees under the rules that govern private employers. On the other hand, where the conduct in question is the regulation of

---

**9.** Indeed, several courts have concluded that Amtrak can be a state actor in the context of false arrest claims brought against Amtrak security officers. *See, e.g., Merola v. National R.R.* *Passenger Corp.,* 683 F.Supp. 935, 940–41 (S.D.N.Y.1988); *Sisak v. National Railroad Passenger Corp.,* 1992 WL 42245 (S.D.N.Y. February 24, 1992).

speech, enormous differences follow from whether the actor is deemed to act as government or as a private individual. And to allow an entity controlled by and intertwined with the government to regulate, control, or censor speech in the manner that is permitted for a private actor risks to do enormous damage to one of the most important principles of the Bill of Rights.

If Amtrak is deemed a private actor for this purpose, it would enjoy the full range of the private citizen's rights of free speech under the First Amendment. It would be free to exercise discriminatory control over the messages transmitted by its billboards. For example, as the Presidential election approached, Amtrak would have the absolute right to devote all of its billboards to champion the reelection of the incumbent president and warn of danger to the republic if the challenger should be elected. Amtrak would enjoy this right, just like the owner of a private bar or bowling alley who has the undeniable right to cover the walls, if he chooses, with posters advocating the reelection of the president. Similarly, Amtrak would be free to sponsor advertisements on its billboards either opposing abortion or favoring choice; it could likewise advocate adherence to Catholicism and deprecate Protestantism, or vice versa, as it chose.

If, on the other hand, Amtrak's billboard regulation is deemed governmental, Amtrak would be barred from favoring a political candidate, from favoring messages of any chosen viewpoint, from sponsoring messages that established religion, from exercising arbitrary discrimination in allowing access to its billboards, and from regulating the speech of its billboard tenants in any way, except within narrow parameters.

Among the most powerful principles asserted by our Constitution are those found in the First Amendment designed to prevent Government from exercising discretionary control over the content of the speech of private persons and entities. "Regulations which permit the Government to discriminate on the basis of the content

of the message cannot be tolerated under the First Amendment," *Regan v. Time, Inc.*, 468 U.S. 641, 648–49, 104 S.Ct. 3262, 3267, 82 L.Ed.2d 487 (1984) (citations omitted), for "the Government's ability to impose content-based burdens on speech raises the spector that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, —— U.S. ——, ——, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991) (citation omitted).

Given the force of this principle, it is inconceivable that Amtrak, whose directors are appointed by the President, whose operations are financed by the Government, and which is subject to Governmental control and intertwinement in all the respects outlined above, would be free under the First Amendment to donate its billboards to the support of the incumbent President's reelection campaign. But that is the inevitable consequence if Amtrak is correct in its contention that it is engaged in private action when it controls the content of ads on its billboards.

One might argue that the conclusion should be otherwise when control is exercised not by the Presidentially appointed directors, but by a lower level employee. But the argument is not persuasive. Regardless to what degree the board of directors exercises its control, it has the power to control the actions of the corporation it governs. Furthermore, the controls here at issue were exercised by a high officer, the director of Amtrak's real estate operations, to whom the Amtrak board had directly delegated such authority.[10]

I conclude that, notwithstanding Amtrak's private character in its employment contracts, it must be deemed to engage in governmental action when it undertakes to regulate the content of the advertisements on its billboards.      .

B. *The Requirements of the First Amendment*

I now turn to the question whether Amtrak's actions comport with the require-

---

**10.** Indeed, the minutes of meetings of Amtrak's board of directors show that the board has, on at least one occasion, authorized an individual lease for the Spectacular.

ments that the First Amendment places on such governmental conduct.

Along with other constraints, the First Amendment requires that, when the government regulates speech, it must do so by a policy that is (i) clearly set forth, (ii) not so vague as to be subject to abuse, (iii) consistently applied and (iv) not based on viewpoint. These rules are intended to avoid the risk that government may impose arbitrary, discriminatory, or preferential controls on speech. *See generally City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757–764, 108 S.Ct. 2138, 2144–47, 100 L.Ed.2d 771 (1988) (invalidating ordinance giving town mayor complete discretion in licensing sidewalk newsracks). Without explicit standards, clearly disclosed, government regulation of speech may be applied in an arbitrary and discriminatory manner. *See Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972); *Cramp v. Board of Public Instruction*, 368 U.S. 278, 286–87, 82 S.Ct. 275, 280, 7 L.Ed.2d 285 (1961) (terms of regulation must be "susceptible of objective measurement"). The Supreme Court has cautioned that a scheme for regulating speech "that places 'unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.'" *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225–26, 110 S.Ct. 596, 605, 107 L.Ed.2d 603 (1990) (quoting *Lakewood*, 486 U.S. at 757, 108 S.Ct. at 2144). "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963). In addition, a government restriction may not discriminate against speech on the basis of the viewpoint of the speaker. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983) (regulation of public forum must be content-neutral; regulation of non-public forum must be viewpoint-neutral); *see also United States v. Kokinda*, 497 U.S. 720, 729, 110 S.Ct. 3115, 3121, 111 L.Ed.2d 571 (1990); *Longo v. United States Postal Service*, 953 F.2d 790, 796

(2d Cir.) ("'[r]estrictions on expression because of disagreement with message or idea being conveyed by the speaker" violate First Amendment), *vacated and remanded on other grounds*, — U.S. —, 113 S.Ct. 31, 121 L.Ed.2d 5 (1992), *reinstated*, 983 F.2d 9 (2d Cir.1992); *see generally International Society for Krishna Consciousness v. Lee*, — U.S. —, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992).

I find that Amtrak's policy violates the first three (and possibly also the fourth) of these requirements.

(i) *Not clearly set forth.* The Amtrak policy identified by Mr. DeAngelo as the reason for the rejection is its prohibition of "political" advertisements in Penn Station. Nowhere is this policy committed to writing. Nor was the existence of the policy disseminated. Thus TDI, which leased out nearly all the billboards in Penn Station without consulting Amtrak, was unaware of the policy's existence. An unwritten censorship policy is susceptible to inconsistent application that threatens free speech. *See Lakewood*, 486 U.S. at 757, 108 S.Ct. at 2144; *see also Abel v. Town of Orangetown*, 759 F.Supp. 161, 164–65 (S.D.N.Y. 1991) (invalidating zoning ordinance allowing town board unfettered discretion in granting consent to place sign on town property); *New Alliance Party v. Dinkins*, 743 F.Supp. 1055, 1064–65 (S.D.N.Y.1990) (special events permitting system of parks violated First Amendment where permits granted or refused without any regulatory guidelines).

In attempting to identify a writing that contains its policy, Amtrak points to two earlier advertising licensing agreements between Amtrak (or its predecessor, the Pennsylvania Railroad Company) and TDI. These agreements, dated 1967 and 1980, governed TDI's leasing of the Spectacular. Both agreements contained a provision stating that Amtrak could refuse any advertising that Amtrak, "in its judgment," may deem "unlawful, immoral, improper or offensive to good taste ... or involve political or other views which could result in dissension or involve [Amtrak] in dissen-

sion, complaints or controversy with its patrons or the public...."

However, neither of these licensing agreements is still in effect. The 1980 agreement, which superseded the 1967 agreement, was itself superseded by another agreement in 1985 covering all Amtrak billboards in Penn Station. The 1985 agreement and its successor, the 1991 agreement, do not include any provision comparable to the one in the 1967 and 1980 agreements. They do state that, "All advertising material, exhibit material, notices and advertisements, and their manner of presentation and design, shall be subject to approval by Amtrak, which may disapprove any such items at its own discretion." This broad provision clearly does not state, or even imply, the rejection of all "political" advertising.

Moreover, the evidence makes clear that Amtrak's supposed policy rejecting "political" advertising was not even known to many of those responsible for billboard advertising. William P. Delaney, a project manager in Amtrak's Real Estate Department who is responsible for supervising Amtrak's arrangements with TDI for advertising in Amtrak's facilities, knew of no prohibition on "political" advertising applicable to any of Amtrak's facilities. None of the executives at TDI, who had been leasing Penn Station billboard space for years and who had authority to approve advertising copy for all areas other than the Spectacular, knew of Amtrak's policy barring "political" advertisements.

(ii) *Vague.* Even if Amtrak's policy, as expressed by Mr. DeAngelo, were in writing, or otherwise clearly set forth, such a policy would still be constitutionally infirm, for the term "political" is of such unclear meaning that it is easily susceptible to arbitrary or discriminatory censorship by those administering the policy. *See Bullfrog Films, Inc. v. Wick,* 847 F.2d 502, 513–14 (9th Cir.1988) (invalidating as vague regulations that barred issuing educational certificates to documentary films that attempted "to influence opinion, conviction or policy (religious, economic, or political propaganda), to espouse a cause, or conversely,

when they seem to attack a particular persuasion" and that "appear to have as their purpose or effect to attach or discredit economic, religious, or political views or practices"); *see also Coates v. Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971) ("conduct ... annoying to persons passing by" unconstitutionally vague); *Gay Men's Health Crisis v. Sullivan,* 792 F.Supp. 278, 293–96 (S.D.N.Y. 1992) ("offensive to a majority of adults" unconstitutionally vague).

The policy might be thought, for example, to bar only advertisements relative to candidates for political office. It might be thought to encompass public service messages on public issues, including drunk driving, safe sex, abortion counselling, and religious messages. It might also cover commercial advertising that included public service messages like "Keep America Beautiful," or that discussed controversial issues.

Amtrak's executives were themselves at odds over the meaning of Amtrak's policy. Mr. DeAngelo at times indicated that the policy prohibited only those advertisements that were both "political" *and* divisive or objectionable; at other times, he stated that the policy prohibited all advertisements that were not devoted to the selling of a product or service. Bruce M. Bourque, Amtrak's Project Director for Real Estate Development for Penn Station, who first reviews advertising material submitted for the Spectacular, knew that there was a policy barring "political" advertisements, but he could not really say what such a policy meant. *See U.S. Southwest Africa/Namibia Trade & Cultural Council v. United States,* 708 F.2d 760, 769 (D.C.Cir.1983) ("the hazy line between ideological and commercial speech is reflected in the record of this case").

This is not to say that reasonable individuals could never agree that a particular advertisement was or was not "political." As the court explained in *U.S. Southwest Africa/Namibia Trade & Cultural Council v. United States,* 708 F.2d at 769,

The point is not that the distinction between commercial and political speech is

entirely unworkable—there is little doubt that it can operate successfully at the extremes to screen out patently political from wholly commercial advertisements. Rather, the point is that there is a gray area near the middle in which this particular subject matter restriction tends to operate as a *sub rosa* penalty on presenting political viewpoints in "controversial," as opposed to more benign "commercial," forms.

This again reflects the manner in which Amtrak's policy is susceptible to abuse, for "[a]pplying this guideline involves an exercise of discretion and subjective judgment on the part of [Amtrak] officials." *Lebron v. Washington Metropolitan Area Transit Authority*, 749 F.2d 893, 899 (D.C.Cir. 1984). In such circumstances, the threat is great that "the policy operates in part to screen out only controversial, but not noncontroversial, political messages." *U.S. Southwest Africa/Namibia Trade & Cultural Council*, 708 F.2d at 769.

Amtrak contends that the term "political" as employed in its policy means to include (and therefore prohibit) all advertisements that do not seek to sell a product or service. However, that is certainly not what the term "political" is generally understood to mean, and, as noted, this is not how the relevant personnel understand the policy. When a standard for governmental control of speech is so unclear, there is a high likelihood of inconsistent and discriminatory application. Such a vague policy provides Amtrak officials with precisely the kind of unfettered discretion to control speech that the Supreme Court has held to contravene the First Amendment. *See, e.g., FW/PBS, Inc.*, 493 U.S. at 226, 110 S.Ct. at 605; *Lakewood*, 486 U.S. at 757, 108 S.Ct. at 2144; *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969); *Saia v. New York*, 334 U.S. 558, 560, 68 S.Ct. 1148, 1149, 92 L.Ed. 1574 (1948) ("There are no standards prescribed for the exercise of [the official's] discretion."); *see generally Staub v. City of Baxley*, 355 U.S. 313, 322, 78 S.Ct. 277, 282, 2 L.Ed.2d 302 (1958) ("It

is settled by a long line of recent decisions of this Court that an ordinance which ... makes the peaceful enjoyment of freedoms with the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.").

(iii) *Not consistently applied.* A further infirmity in Amtrak's "no political advertisements" policy is that it is not consistently applied. As noted above, the policy is unknown to Amtrak's leasing agent, with the result that billboard space in Penn Station has repeatedly been leased for advertisements that are "political" in the sense of Amtrak's definition. Indeed, the licensing agreement between Amtrak and TDI expressly allows for public service advertisements (at reduced rates or no charge). And TDI maintains written *Guidelines For Public Service Advertising.* They provide that such advertising will be displayed (at less than full rate) for no more than a thirty day period, only when space is available and may be preempted by any commercial (*i.e.* full rate) advertising. The guidelines are designed to insure that such non-commercial advertisements shall be accepted only from "recognized, legitimate [tax exempt] not-for-profit organizations, corporations, National, State or Local government agencies and subdivisions, philanthropic or cultural organizations whose activities would be of interest or benefit to a majority of the area population," and that the advertisements adhere to "good taste, decency and community standards." It is clear that all of the advertisements covered by the Guidelines for Public Service Advertising are of the type that Amtrak contends are prohibited by its rule.

Furthermore, TDI's leasing guidelines do recognize a distinction affecting advertisements that are "political." The TDI guideline, however, does not reject them, but rather considers them commercial and therefore subject to full rate charge.[11]

---

11. Particularly baffling in the context of this case is the TDI guideline that states:

It is clear beyond dispute that Amtrak's policy is not being consistently followed. TDI's records show that it leases space to advertisers that are not "commercial," and some of which are arguably "political." These include the New York Department of the Environment, the New York Department of Commerce, a foundation for muscular dystrophy, and *Plain Truth* magazine, a free magazine on political and social issues published by The Worldwide Church of God. In addition, testimony of the general counsel of TDI indicates that TDI regularly displays public service advertisements, including subjects such as the homeless, the environment, drunk driving, AIDS awareness, health issues, and race relations.[12]

(iv) *Void for viewpoint bias.* Furthermore, depending on which of the many proferred versions really is Amtrak's policy, the policy may also be void because of discrimination based on viewpoint. *See Perry Educ. Ass'n,* 460 U.S. at 45–46, 103 S.Ct. at 955.

If, for example, Amtrak's policy, as Mr. DeAngelo sometimes testified, is directed against divisive, controversial, or objectionable matter, or if, as set forth in the 1967 and 1980 agreements with TDI, it gives Amtrak discretion to refuse any advertising involving "views which could result in dissension or involve [Amtrak] in dissension, complaints or controversy with its patrons or the public ...," it would be void; government may not regulate speech by such criteria. *Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 2544, 105 L.Ed.2d 342 (1989). "[T]he use of the controversial nature of speech as the effective touchstone for regulation 'threatens a value at the very core of the First Amendment, the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." ' " *U.S. Southwest Africa/Namibia Trade & Cultural Council,* 708 F.2d at 769 (quoting *Consolidated Edison Co. v. Public Service Commission,* 447 U.S. 530, 548 n. 9, 100 S.Ct. 2326, 2335 n. 9, 65 L.Ed.2d 319 (1980) (Stevens, J., concurring) (quoting *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964))). An advertisement such as Lebron's

cannot be prohibited ... merely because it provokes disagreements and offends the sensibilities of the majority. "Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." It is precisely this speech for which the protection of the First Amendment was intended.

*Penthouse International, Ltd. v. Koch,* 599 F.Supp. 1338, 1350 (S.D.N.Y.1984) (citation omitted); *see also Terminiello v. City of Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949) ("A function of free speech under our system of government is to invite dispute."); *United States v. Schwimmer,* 279 U.S. 644, 654–55, 49 S.Ct. 448, 451, 73 L.Ed. 889 (1929) (Holmes, J., dissenting) ("not free thought for those who agree with us but freedom for the thought that we hate").

If the policy is as set forth in TDI's guidelines, whether for Public Service Advertising or for Commercial Advertising, it is void for the same reason, for these guidelines are designed to ensure against advertising that is controversial, in bad taste, or inconsistent with the taste and preferences of the majority of the community. Such standards are of course permissible for a private actor, but not for a governmental actor or an actor whose symbiotic relationship with government renders

Because of the separation of Church and State dictates of our Constitution, organizations that are primarily religious in structure *do not* qualify for Public Service space. (Emphasis in original).

**12.** Amtrak contends that its policy has been consistently applied *with respect to the Spectacular,* as it has never had a political advertisement in that space. Amtrak does not contend, however, that its policy against political advertisements applies only to the Spectacular.

But even if it did, the policy would nonetheless be void for the first two reasons discussed: that it is not written or clearly disseminated and that it is too vague to be consistently applied (and also perhaps for the fourth reason discussed, that it is viewpoint-based censorship, depending on the meaning of Amtrak's policy).

the act of regulation governmental. Because Amtrak is saturated with the presence of the federal government, it may not regulate speech in an effort to shield its customers from the abrasive, the obnoxious, the controversial.

### Conclusion

Plaintiff Lebron has convincingly demonstrated that in rejecting his contract to display his art on its billboard Amtrak was engaged in governmental action and that the standards employed by Amtrak in rejecting his work violated its obligations under the First Amendment.[13]

Defendants are accordingly directed to give plaintiff immediate access to the Spectacular in accordance with his contract.

SO ORDERED.

---

**13.** I do not reach Lebron's alternative contract theory because this resolution makes it superfluous.