STREETWATCH, et al., Plaintiffs,

v.

NATIONAL RAILROAD PASSENGER
CORPORATION, et al.,
Defendants.

No. 94 CIV 4254 (CBM).

United States District Court,
S.D. New York.

Feb. 21, 1995.

Center for Constitutional Rights by Michael Deutsch and Jerome N. Frank Legal Services Organization, Yale Law School by Robert A. Solomon, Gerald P. Hauser, for plaintiffs.

Siff Rosen, P.C. by Mark S. Landman, Lori B. Wolmetz, for defendants.

## OPINION ON MOTION
## FOR PRELIMINARY
## INJUNCTION

MOTLEY, District Judge.

### I. Findings of Fact and Conclusions of Law.

This case, as filed, included claims pursuant to 42 U.S.C. §§ 1983 and 1988; the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the United States Constitution; Article 1, Sections 8, 9 and 11 of the New York State Constitution; the Administrative Procedure Act, 5 U.S.C. § 551 et seq.; and the common law of the State of New York.

However, for the purpose of this motion for a preliminary injunction, the parties focussed on the rights of the individual plaintiffs who are homeless, or persons perceived by the Defendants to be homeless, to simply loiter in Penn Station.

Plaintiffs concede that they do not have the right to seek overnight shelter in Penn Station.

They also agree that Defendants may provide seats in Penn Station for ticketed passengers only.

Plaintiffs do not claim freedom from arrest for probable cause while they are in Penn Station. Plaintiffs do assert, however, that Defendants' policies and practices single out Plaintiffs for harassment and ejectment from Penn Station based solely upon Defendants' perception that the named individual Plaintiffs are homeless or are merely loitering for no purpose in Penn Station.

At the conclusion of the Plaintiffs' case involving the rights of the homeless or loiterers, the court defined the main issue to be

resolved on this motion as follows: "whether people who are simply there, people who look dishevelled and look homeless, can be asked to leave, even though they have not committed any crime or are not committing a crime, and whether they can be arrested for trespass for doing that—remaining in and about Penn Station." (R. at 779.) For the reasons discussed below, this question must be answered in the negative and the motion, therefore, is granted.

After hearing the evidence and after weighing the testimony, exhibits received in evidence and the credibility of the witnesses, the court makes the following findings of fact and conclusions of law:

A. The Parties.

1. Plaintiff StreetWatch is an unincorporated membership association operating in New York City. Its purpose is to monitor police and private security forces' treatment of homeless people and people they perceive to be homeless in public areas of New York City; to interview homeless people about their experiences of harassment and abuse; to document in notes and on videotape instances of physical abuse of homeless people by police and private security; and to make residents of New York aware of the physical abuse of homeless people by police and private security through various public education efforts. StreetWatch has approximately 60 volunteer members including students, waiters, accountants, teachers, real estate brokers, lawyers, artists, and filmmakers. (Compl. ¶ 6.)

2. The individually named Plaintiffs, Elizabeth Beer, Brad Lichtenstein, James Gray, Ellis Neder, Emily Nussbaum, Deborah Anderson, J.J. Gilbreath, Lynn Vogelstein, Heidi Tinsman, William Broberg, and Lisa Daugaard are members of StreetWatch. (Compl. ¶ 7.)

3. The individually named Plaintiffs, Robert Grant, Kevin Carpenter, Al Franklin, William Wilson, Ahme Saah, Wayne Baldwin, Steve Aal, Carlos Rosado, Ray Cooper, Malcolm Dwight Scott, William Johnson, Michael Martinez, and Edwin Perez are or have been homeless. (Compl. ¶ 8.)

4. Defendant National Railroad Passenger Corporation ("Amtrak") is a corporation created by the Rail Passenger Service Act of 1970, 45 U.S.C. § 501 et seq. (Compl. ¶ 9.) As provided by Congress, Amtrak's principal function is to "provide ... modern, cost-efficient, and energy efficient intercity railroad passenger service between crowded urban areas and in other parts of the country ... [so as to enable] travelers in America ... [to] have the freedom to choose the mode of transportation most convenient to their needs." 45 U.S.C. § 501(a).

5. Pursuant to 45 U.S.C. § 545(j), Amtrak maintains a Police Department whose officers are appointed by the New York Superintendent of State Police under § 88 of the New York Railroad Law. These Amtrak police officers have "all the powers of a policeman in cities and villages, for the preservation of order and of the public peace, and the arrest of all persons committing offenses upon the land of or upon property in the custody of or under the control of [Amtrak]." N.Y.R.R.Law § 88(1) (McKinney 1991).

6. The individually named Defendants are officers in the Amtrak Police Department. (Compl. ¶¶ 10–17.)

7. Pennsylvania Railroad Station ("Penn Station") is an important hub of interstate travel and intrastate transportation. From Penn Station, one can access Amtrak's national rail network covering at least 44 states, travel to New Jersey on New Jersey Transit, travel to points east on the Long Island Railroad and travel around New York City on a number of subway lines. (R. at 43–44, 156, 635, 652, 928.)

8. Penn Station is also far more than just a transportation facility. (R. at 999–1000.) A myriad of services entice the general public to enter and remain in Penn Station. In addition to rail transportation on Amtrak, New Jersey Transit, the Long Island Railroad, and the subway, the Penn Station complex houses commercial establishments, including a number of restaurants, bars, fast food outlets, newsstands, electronics stores, beeper stores, and other commercial establishments. (R. at 17–18, 155–56, 391–92.) Public telephones and public restrooms are available. (R. at 1000.) The concourses of

Penn Station are laid out and used as walkways to subway stops and provide sheltered access from one part of the City to another. (R. at 156.) Penn Station is continuously open to the public until 12:00 A.M..(R. at 156, 741–42, 752–53, 1003.) Upwards of 200,000 people pass through it every day. (R. at 1070–71.)

### B. Amtrak's Rules of Conduct Affecting the Homeless in Penn Station.

9. Amtrak has adopted Rules of Conduct to govern public access to and conduct in Penn Station. *See* Pls.'s Ex. 6. The Preamble to these Rules of Conduct defines "public areas" of the Station as those "which are intended for use by the public in accessing transportation, arcades, restaurants, shops, offices and other businesses in the facility, *in traveling through the station, from one point to another,* in waiting for transportation, and in using public lavatory facilities and public pay telephones or other services as may be permitted pursuant to these Rules." (Pls.'s Ex. 6 at 1.) (emphasis added). Under the heading "Prohibited Uses," the Rules list a number of specific activities; however, this section concludes with a catch-all prohibition against "[o]therwise engag[ing] in any activity which interferes with the commercial activities of lessees, tenants and their customers." (Pls.'s Ex. 6 at 2.) This general clause is based on the New York State Penal Code, the Preamble to the Rules, and Amtrak's officials' perceptions of common sense. (R. at 947–48, 951, 1001.)

10. Amtrak officials maintain that walking around or "hanging out" in Penn Station hour after hour does not constitute a legitimate business purpose and is not a designated use as set forth in the Preamble of the Rules of Conduct. (R. at 947–55.) However, the Rules of Conduct do not expressly forbid walking or wandering around the Station, nor do they prohibit anyone from being there for more than a specified period of time. (R. at 840.)

11. Among the purposes Amtrak cites for its Rules of Conduct are reducing congestion, maintaining cleanliness, consistency with the rules used by the Long Island Railroad, providing a comfortable and safe environment for travelers and preventing crime. (R. at 179, 806–07, 809–10, 845–46, 929–31, 941, 954–55, 979, 1060–65.) However, the Rules of Conduct evolved from, and are a continuation of, an earlier policy of ejecting the homeless from Penn Station as "undesireables." (Pls.'s Ex. 2; Pls.'s Ex. 5; R. at 804, 812–13, 819, 823, 825, 945, 1017–25.) An Amtrak internal memorandum lists as groups of undesireables the "homeless, pan handlers, ticket scalpers, and thieves." (Pls.'s Ex. 13; *see also* Pls.'s Ex. 14.)

12. Amtrak police officers rely on the Rules of Conduct, the New York Penal Law, and the officers' own experience and discretion in determining whether a given individual has a legitimate business purpose for being in Penn Station. (R. at 259, 804, 844, 1005–07, 1011, 1013–15, 1025, 1066–67.) Among the factors that officers consider in making such determinations are the condition, conduct, and location of the individual, the time of day, and the length of the individual's stay. (R. at 179–81, 804–06, 844.) Other than the Rules of Conduct discussed above, there are no written guidelines to govern or contain any aspect of how these officers exercise their discretion. (R. at 844, 849–50, 1003, 1006, 1010–11, 1015, 1025–27.)

13. Amtrak specifies procedures for its officers to follow in ejecting individuals from Penn Station. Before ejecting an individual from Penn Station, an officer is required to warn that individual that he or she has no right to remain in the Station and that he or she should leave voluntarily. (R. at 972.) If the individual refuses to leave the Station voluntarily, the officer is instructed to give him or her a five-minute cooling off period which often results in the individual leaving on his or her own. (Defs.'s Ex. Q; R. at 972.) If, after the five minutes, the individual still refuses to leave voluntarily, then a supervisor is to be called to the scene to evaluate whether or not the individual should be ejected or, instead, arrested. (Defs.'s Ex. Q; R. at 804–06, 856–57, 924, 972, 1034–35.) The supervisors make these determinations based on the particular circumstances of each case, including the time, the condition and the location of the individual. (R. at 804–06, 856–57, 972.)

14. Several of Plaintiffs' witnesses, some of whom were members of StreetWatch, testified that numerous individuals have been arrested or ejected solely based on the perception of the arresting officer that they were homeless or associating with the homeless, and often without being questioned or offered an explanation of which of the Rules of Conduct they had violated. (R. at 4–7, 16–20, 27, 43–47, 49–50, 55, 105–10, 113, 274, 278–79, 391–95, 444–57, 469–70, 499–501, 518, 597–603, 636–41, 664, 673–75, 709–11.) With regard to several of these incidents, Defendants suggest that the individuals involved were ejected because they had been hanging around the Station for too long, even though the Rules do not expressly prohibit this. (R. at 18–20, 37–39, 43–45, 49–50, 66, 79–81, 465.) Concerning some other incidents, Defendants note that in the past the individuals involved admitted that they had been sitting without tickets in a seating area reserved for ticketed passengers. (R. at 75, 107–08, 113.) The area for ticketed passengers has now been cordoned off and an usher stationed at the entrance. (R. at 935–36, 978, 1008.) In another incident, the arrested individual had violated the Rules of Conduct by sitting and eating in a restricted area, but he testified that he was given no explanation of his misconduct until after he was taken to a holding pen in an Amtrak office. (R. at 451–52.)

15. Various of Plaintiffs' witnesses testified that Amtrak is more vigorous in applying its ejection policy against minorities than against whites. (R. at 103–06, 112–13, 118–19, 125, 127–28, 277, 282–83, 285, 545–46, 573–75, 677–78, 703, 713.) However, a number of the same witnesses testified to the effect that homeless or dishevelled whites are also ejected from Penn Station. (R. at 118–19, 128–29, 147–48, 210–11, 397, 420–21, 512, 527, 546–47, 550–54, 560, 894–95, 942.) Further, Defendants suggest that any disparate impact upon minorities is due to the fact that they are over-represented in the homeless population. (R. at 100, 119.)

16. Amtrak's own police procedures manual specifically directs the police to use the least amount of force necessary in a given situation. (Defs.'s Ex. P at 7–8.) Furthermore, Amtrak adopted the above-described five-minute cooling off period partly as a means of reducing the likelihood of violent altercations between police officers and citizens. (R. at 1049–50.) Also, a series of Amtrak safety memos instructed officers not to follow evictees up escalators. (Pls.'s Exs. 7–9, all at 2.)

17. Plaintiffs offer testimony of various witnesses, including other homeless individuals, StreetWatch volunteers, and others, regarding incidents in which individuals were punched, shoved or struck with batons, shoved against walls or pillars, thrown to the ground, kicked, maced, dragged, beaten, or otherwise physically accosted by Amtrak police. (R. at 7–12, 45–47, 61, 66–68, 129, 138–39, 210–13, 247–49, 253–54, 269–79, 281–82, 285, 397–99, 446, 449–58, 500–03, 602–03, 621–22, 636–40, 659, 673, 684, 696.)

## II. The Standard for Issuance of a Preliminary Injunction.

The standard for issuance of injunctive relief in the Second Circuit is well-settled. Plaintiff must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). *See also Paulsen v. County of Nassau*, 925 F.2d 65, 68 (2d Cir.1991); *Fireman's Fund Ins. Co. v. Leslie & Elliott Co.*, 867 F.2d 150, 150 (2d Cir.1989).

## III. Irreparable Harm.

" 'When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.' " *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984) (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2948, at 440 (1973)). *See also Elrod v. Burns*, 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971); *Co-*

*vino v. Patrissi,* 967 F.2d 73, 77 (2d Cir. 1992).

As discussed in detail below, Plaintiffs have demonstrated a likelihood of success on the merits of their claims that Defendants have deprived, and are continuing to deprive, Plaintiffs of constitutionally protected rights. Specifically, Defendants' enforcement of the Rules of Conduct for Penn Station violates Plaintiffs' right to due process of law in two related ways. First, the Rules of Conduct are unconstitutionally vague. *See, e.g., Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 165, 168–70, 92 S.Ct. 839, 843, 845, 846–47, 31 L.Ed.2d 110 (1972); *Kolender v. Lawson,* 461 U.S. 352, 357–58, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). This vagueness is especially troublesome because enforcement of these Rules of Conduct implicates Plaintiffs' fundamental freedom of movement. *See, e.g., Shapiro v. Thompson,* 394 U.S. 618, 629–30, 89 S.Ct. 1322, 1328–29, 22 L.Ed.2d 600 (1969); *Aptheker v. Secretary of State,* 378 U.S. 500, 505–06, 84 S.Ct. 1659, 1663, 12 L.Ed.2d 992 (1964); *Kent v. Dulles,* 357 U.S. 116, 126, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958); *King v. New Rochelle Mun. Hous. Auth.,* 442 F.2d 646, 648 (2d Cir.), *cert. denied,* 404 U.S. 863, 92 S.Ct. 113, 30 L.Ed.2d 107 (1971); *Lutz v. City of York,* 899 F.2d 255, 268 (3d Cir.1990). Second, Plaintiffs have presented sufficient evidence that Amtrak police officers enforcing the Rules have violated due process by repeatedly arresting individuals when there was no evidence that those individuals had committed any crimes. *See Thompson v. City of Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960); *Garner v. Louisiana,* 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961). As the Second Circuit indicated in *Mitchell v. Cuomo, supra,* Plaintiffs need show no more than this to establish irreparable harm.

## IV. Likelihood of Success on the Merits.

Plaintiffs' initial focus in this case on the rights of the homeless in Penn Station raises four principal legal issues: (1) the nature of the public invitation to enter and remain in Penn Station extended by Amtrak; (2) whether Amtrak's Rules of Conduct are un-

constitutionally vague; (3) the impact of Amtrak's enforcement of these Rules on Plaintiffs' freedom of movement; and (4) whether Amtrak police can arrest a person who refuses to leave voluntarily when there is no evidence that that person has committed or is committing any crime. These issues are addressed in order below.

A. The Nature of the Public Invitation to Enter and Remain in Penn Station Extended by Amtrak.

The question of the extent to which the legal obligations of private property owners change when their property is opened to some significant degree to broad public use has received renewed recent attention in courts in the New York region. This renewed attention seems to be resulting from major demographic and sociological changes in late Twentieth Century American society.

In a very recent case, the Appellate Division of the New York County Supreme Court examined the extent of the liability of the owners of Co-Op City, a massive private housing complex in the Bronx, for injuries to a tenant caused by the criminal activities of third parties that transpired on one of the outdoor walkways in the complex. *See Leyva v. Riverbay Corp.,* 206 A.D.2d 150, 620 N.Y.S.2d 333 (1st Dep't 1994). In finding that there was no such liability as claimed by plaintiff on the facts before it, the court concluded that, although it is privately owned, "Co-Op city is an open community in an open society. It is not gated, nor a fortress; it cannot, without just cause, prevent access to its common outdoor areas." *Id.,* 620 N.Y.S.2d at 337.

In another important recent decision that more closely resembles the instant case, the New Jersey Supreme Court held that regional and community shopping malls must permit leafletting on societal issues, subject only to reasonable conditions set by the malls. *See New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp.,* 138 N.J. 326, 650 A.2d 757 (1994). This opinion was decided under the New Jersey Constitution; indeed, the court expressly acknowledged that the Federal Constitution no longer provides such protection of free speech.

*Id.*, 650 A.2d at 760–61, 769–70. Nevertheless, the analysis the opinion sets forth is instructive.

Considering the normal use of shopping malls, the New Jersey court stated that "[a]lthough the ultimate purpose of these shopping centers is commercial, their normal use is all-embracing, almost without limit, projecting a community image, serving as their own communities, encompassing practically all aspects of a downtown business district, including expressive uses and community events." *Id.* at 761: Continuing, the court noted that "[t]he public's invitation to use the property ... is correspondingly broad. ... For the ordinary citizen it is not just an invitation to shop, but to do whatever one would do downtown, including very little of anything." *Id.* at 761. Finally, the court stated that the plaintiffs' leafletting activities were perfectly consistent with the normal uses of the malls. *Id.*

With regard to underlying policy, the New Jersey Supreme Court underscored the importance of the changing institutional role of malls:

> If constitutional provisions of this magnitude should be interpreted in light of a changed society, and we believe they should, the most important change is the emergence of these centers as the competitors of the downtown business district and to a great extent as the successors to the downtown business district. The significance of the historical path of free speech is unmistakable and compelling: the parks, the squares, and the streets, traditionally the home of free speech, were succeeded by the downtown business districts, often including those areas, the downtown business districts where that free speech followed. Those districts have now been substantially displaced by these centers. *Id.* at 778.

Federal law in this area has its roots in *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). In that case, the Supreme Court held that a company town, that is a town which, with the sole exception of being privately owned, is in all respects like any other municipality, is subject to the constraints of the First and Fourteenth Amendments. *Id.* at 508–09, 66 S.Ct. at 279–80. In 1968, the Court extended the *Marsh* rationale to apply to shopping malls in *Amalgamated Food Employees Union v. Logan Valley Plaza,* 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968). In *Logan Valley,* union members began picketing one of a mall's tenants, a store with entirely nonunion staff. *Id.* at 311–12, 88 S.Ct. at 1604–05. In overturning a state court injunction that required the picketers to restrict their activities to public areas outside of the mall, the Supreme Court held that the mall was the "functional equivalent of the business district" examined in *Marsh. Logan Valley,* 391 U.S. at 318, 88 S.Ct. at 1608. Thus, the First Amendment was held to apply to the mall. *Id.* at 319–20, 88 S.Ct. at 1608–09. However, the Court emphasized that its holding was limited to situations like the one before it where the expressive activity was "directly related in its purpose to the use to which the shopping center property was being put." *Id.* at 319 n. 9, 88 S.Ct. at 1609 n. 9.

Just four years later, the Court began its retreat from this doctrine. *Lloyd Corp. v. Tanner,* 407 U.S. 551, 555–56, 92 S.Ct. 2219, 2222, 33 L.Ed.2d 131 (1972), involved facts similar to those in *Logan Valley,* except that the expressive activity involved was that of Vietnam War protesters who were handing out leaflets in violation of a mall's standing policy of prohibiting any and all distribution of handbills. In examining the case, the Court focussed on two considerations: the carefully limited extent of the mall owner's public invitation and the availability of an alternative forum for the protestors. Concerning the first of these, the Court emphasized the fact that "the invitation extended to the public. ... [was for the public] to come to the Center to do business with the tenants." *Id.* at 564, 92 S.Ct. at 2227. In other words, there was "no open-ended invitation to the public to use the Center for any and all purposes, however incompatible with the interests of both the stores and the shoppers whom they serve[d]." *Id.* at 565, 92 S.Ct. at 2227. As for the second factor, the Court gave great weight to the fact that excluding the leafletting activity from the interior of the mall would not leave the protesters with-

out a reasonable, alternative venue for their expressive activity. *Id.* at 566–67, 92 S.Ct. at 2227–28. The Court concluded, therefore, that the protesters, whose activity was not directly related to the use to which the mall was being put, were not protected by the First Amendment from being excluded from the mall. *Id.* at 564, 570, 92 S.Ct. at 2226, 2229.

The death of the *Logan Valley* doctrine was announced in *Hudgens v. NLRB,* 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976). *Hudgens* again presented the Court with union members picketing at a store in a shopping mall. *Id.* at 509, 96 S.Ct. at 1031. However, in reviewing its own precedents, the Court reached the conclusion that the effect of the *Logan Valley* and *Lloyd Corp.* decisions was to allow mall owners to engage in content discrimination. *Id.* at 520, 96 S.Ct. at 1036. Since such discrimination is absolutely prohibited by the First Amendment, the Court concluded that "the constitutional guarantee of free expression has no part to play in a case such as this." *Id.* at 521, 96 S.Ct. at 1037.

More recently, the Second Circuit held that "Amtrak is not a governmental actor subject to the strictures of the First Amendment." *Lebron v. National R.R. Passenger Corp.,* 12 F.3d 388, 389 (2d Cir.1993), *cert. granted,* —— U.S. ——, 114 S.Ct. 2098, 128 L.Ed.2d 661 (1994). However, as the above-quoted language indicates, *Lebron* addresses the applicability only of the First Amendment free speech requirements. *See also Id.* at 391–92. As the District Court noted in the same case, "[w]hether conduct of a particular entity will be deemed governmental action can vary with the type of action at issue." *Lebron v. National R.R. Passenger Corp.,* 811 F.Supp. 993, 999 (S.D.N.Y.) (Leval, J.), *rev'd,* 12 F.3d 388, 389 (2d Cir.1993), *cert. granted,* —— U.S. ——, 114 S.Ct. 2098, 128 L.Ed.2d 661 (1994). *See also Wahba v. New York University,* 492 F.2d 96, 100 (2d Cir.), *cert. denied,* 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974) (Friendly, J.) ("[W]e do not find decisions dealing with one form of state involvement and a particular provision of the Bill of Rights at all determinative in passing upon claims concerning different forms of governmental involvement and other constitutional guarantees.").

To what extent, then, has Amtrak invited the general public to enter and remain on the premises of Penn Station? The analysis of the New Jersey Supreme Court makes clear that a court considering the nature of such a public invitation extended by a private property owner must do so in light of the most recent developments in the continuing evolution of our social institutions. In the instant case, the Preamble to Amtrak's Rules of Conduct includes an invitation to the public to use the public areas of Penn Station for "travelling through the station, from one point to another." Penn Station, which is open to the public, is more than just a major transportation facility. In addition to interstate and intrastate rail facilities, Penn Station offers a myriad of services that entice the public to enter and remain in the Station, including restaurants, bars, fast food outlets, newsstands, electronics stores, beeper stores, other commercial establishments, public telephones, and public restrooms. The concourses at Penn Station are laid out and used as walkways to subway stops and provide sheltered access from one part of the City to another.

In a case that is remarkably similar to the one before the court, the New York Court of Appeals described Penn Station as "something of a small, indoor city. These facilities are not places of restricted public access ... but, rather, large, public areas.... Indeed, facilities such as Pennsylvania Station ... are so public in nature, that they actually invite conduct that could be construed as loitering." *People v. Bright,* 71 N.Y.2d 376, 526 N.Y.S.2d 66, 72, 520 N.E.2d 1355, 1361 (1988). In other words, Penn Station is so thoroughly connected to, and integrated with, the surrounding neighborhood, that the Station has become a part of downtown New York City. While urban train stations may in the past have been operated as narrowly defined transportation facilities, at least in New York this is no longer the case. Thus, it can readily be argued that, as presently written and applied, Amtrak's invitation to the public to use Penn Station is sufficiently broad to subject the Defendants to a duty to

respect the due process rights of all persons who enter the station. As discussed below, Plaintiffs have made an adequate showing, on the hearing of this motion for preliminary injunctive relief, with regard to the individual plaintiffs who are homeless or perceived by Defendants as homeless, for this court to find and conclude that Defendants have failed to fulfil their constitutional obligations with respect to the enforcement of their state police powers.

## B. Whether Amtrak's Rules of Conduct are Unconstitutionally Vague.

The principal case in this area is *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972) (Douglas, J.). *Papachristou* addressed the constitutionality of a local vagrancy ordinance that, *inter alia*, criminalized "persons wandering or strolling around from place to place without any lawful purpose or object, [and] habitual loafers." *Id.* at 156 n. 1, 92 S.Ct. at 840 n. 1. In holding that this ordinance was void for vagueness under the Due Process Clause of the Fourteenth Amendment, *see Id.* at 162, 165, 92 S.Ct. at 843, 845, the Court pointed to two problems with the ordinance. First, such a provision " 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.' " *Id.* at 162, 92 S.Ct. at 843. Second, such a provision is prohibited "because it encourages arbitrary and erratic arrests and convictions." *Id.*

Discussing the second prong of this analysis—the open-ended discretion that vague statutes or ordinances give to the police—the Court noted that such discretion is incompatible with the probable-cause standard for arrests required under the Fourth and Fourteenth Amendments. *Id.* at 168–69, 92 S.Ct. at 846–47. With regard to the impact of such discretion on the citizenry, the Court spoke poignantly about the effect upon our society's social outcasts:

> Those generally implicated by the imprecise terms of the ordinance—poor people, nonconformists, dissenters, idlers—may be required to comport themselves according to the lifestyle deemed appropriate by the Jacksonville police and courts. Where, as

here, there are no standards governing the exercise of the discretion granted by the ordinance, the scheme permits and encourages an arbitrary and discriminatory enforcement of the law. It furnishes a convenient tool for "harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure." It results in a regime in which the poor and the unpopular are permitted to "stand on a public sidewalk . . . only at the whim of any police officer." *Id.* at 170, 92 S.Ct. at 847 (citations omitted).

Subsequently, the Supreme Court has emphasized that the second prong of the void-for-vagueness doctrine—the requirement that an ordinance provide law enforcement officials with some "minimal guidelines" for the exercise of their discretion—is the more important factor. *See Kolender v. Lawson*, 461 U.S. 352, 357–58, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). Put another way, an ordinance will not pass constitutional muster if it " 'entrust[s] lawmaking "to the moment-to-moment judgement of the policeman on his beat." ' " *Id.* at 360, 103 S.Ct. at 1859 (alteration of internal quotation in original). The statute at issue in *Kolender*, a California anti-loitering provision, was struck down because its requirement that a suspect provide the police with a " 'credible and reliable' identification" failed to hem police discretion with the necessary minimal guidelines. *Id.* at 355–58, 103 S.Ct. at 1857–58.

The void-for-vagueness doctrine is also entrenched under New York State constitutional law. *People v. Bright*, 71 N.Y.2d 376, 526 N.Y.S.2d 66, 67, 520 N.E.2d 1355, 1356 (1988) (alterations of internal quotation in original) addressed the constitutionality of a New York statute that provided that " '[a] person is guilty of loitering when he . . . [l]oiters or remains in any transportation facility, or is found sleeping therein, and is unable to give a satisfactory explanation of his presence.' " *Bright* arose out of applications of this statute in the Long Island Railroad Concourse at Penn Station as well as in the Port Authority Bus Terminal in New York City. *Id.* In holding that this statute was void under the Due Process Clauses of the Federal and the

New York State Constitutions,[1] the Court of Appeals adopted the same two-pronged analysis articulated in *Papachristou* and *Kolender*. *See Bright*, 526 N.Y.S.2d at 69–70, 520 N.E.2d at 1358–59 (citing cases including *Papachristou* and *Kolender*). Defining loitering as "the act of remaining about or hanging around a place without any apparent purpose," the court concluded that a statute that prohibits mere loitering, as contrasted with loitering for a specific illegal purpose or loitering in a specific place of restricted access, is void for vagueness. *Id.* at 70, 520 N.E.2d at 1359.

Examining the statue before it, the *Bright* court held that the requirement that a suspect give a "satisfactory explanation of his presence" was unconstitutional because, like the similar provision in *Kolender*, it vested the police with unchecked discretion. 526 N.Y.S.2d at 71, 520 N.E.2d at 1360. The court also explicitly rejected the people's argument that Penn Station and the Port Authority Bus Terminal were places of restricted public access. *Id.* at 72, 520 N.E.2d at 1361.

Under the void-for-vagueness doctrine, Amtrak's Rules of Conduct cannot stand. The Preamble to these Rules lists among the permissible uses of Penn Station's public areas "traveling through the station, from one point to another." While Amtrak maintains that walking around or "hanging out" in Penn Station hour after hour does not constitute a legitimate business purpose, the Rules neither expressly forbid such conduct, nor define how much time is too much time for a person to spend walking around the Station. Moreover, Amtrak officials acknowledge that enforcement of its vaguely worded Rules is left almost entirely to the discretion of individual Amtrak police officers and supervisors who are given no other written guidelines. This is the very sort of invitation to arbitrary enforcement that the United States Supreme Court and the New York Court of Appeals have held violates Federal and State standards of due process.

Because Amtrak police officers are appointed by the Superintendent of State Police under § 88 of the New York Railroad Law, Defendants do not dispute that they are state agents. *See Merola v. National R.R. Passenger Corp.*, 683 F.Supp. 935, 940–41 (S.D.N.Y.1988) (holding the proof that Amtrak police officers were appointed under § 88 would establish that these officers were state agents); *Evans v. Newton*, 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966) ("[W]hen private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations."). Thus, these officers must comply with the same constitutional constraints that would apply to any other state officials attempting to enforce Amtrak's Rules of Conduct for Penn Station.

This court finds that Defendants have, indeed, acted arbitrarily. The homeless have been deemed to merit Defendants' displeasure as evidenced by internal Amtrak documents that define the homeless as "undesireables" and as members of a "criminal class." Plaintiffs' witnesses testified that Amtrak police regularly arrest or eject people solely because those people appear to be homeless or associate with the homeless. These witnesses testified further that, in the course of many of these incidents, the police did not offer any explanations of the involved individuals' alleged misconduct. The Due Process Clause prohibits exactly such state abrogation of the human dignity of the poor members of our body politic.

C. The Impact of Amtrak's Enforcement of its Rules of Conduct on Plaintiffs' Freedom of Movement.

The freedom of travel and movement is a fundamental right protected by the United States Constitution. This right has tradi-

---

1. In their Complaint, Plaintiffs implicate Sections 8, 9, and 11 of Article 1 of the New York State Constitution. They do not expressly implicate the Due Process Clause of the New York Constitution, which is found in Article 1, Section 6. However, since the Plaintiffs did raise federal due process issues in the Complaint, and since the *Bright* court analyzes the federal and state provisions in parallel fashion, it follows that consideration of the state due process issue is properly before the court today.

tionally been articulated as a right to interstate or international travel. *See, e.g., Shapiro v. Thompson,* 394 U.S. 618, 629–30, 89 S.Ct. 1322, 1328–29, 22 L.Ed.2d 600 (1969); *Aptheker v. Secretary of State,* 378 U.S. 500, 505–06, 84 S.Ct. 1659, 1663, 12 L.Ed.2d 992 (1964); *Kent v. Dulles,* 357 U.S. 116, 126, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958). Moreover, the Second Circuit has recognized that there is also "a correlative constitutional right to travel within a state." *King v. New Rochelle Mun. Hous. Auth.,* 442 F.2d 646, 648 (2d Cir.), *cert. denied,* 404 U.S. 863, 92 S.Ct. 113, 30 L.Ed.2d 107 (1971). While *King* addressed only travel from one municipality to another, at least one other circuit has recognized a freedom of movement within one's own municipality or community. *See Lutz v. City of York,* 899 F.2d 255, 268 (3d Cir.1990). The Supreme Court has pointed to infringement of the freedom of movement within a locality as one of the problems created by the arbitrary law enforcement permitted under unconstitutionally vague statutes. *See Kolender,* 461 U.S. at 358–60, 103 S.Ct. at 1858–59; *Papachristou,* 405 U.S. at 164, 92 S.Ct. at 844 (describing activities including " 'wandering or strolling' from place to place as "historically part of the amenities of life as we have known them.... [which] have dignified the right of dissent and have honored the right to be non-conformists and the right to defy submissiveness.").

Where a statute or other provision implicates a fundamental right, a court reviewing that provision must apply an especially stringent standard of vagueness. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). There can be little doubt that Amtrak's Rules of Conduct implicate the constitutional freedom of movement. As noted above, Penn Station is far more than a traditional train station. *See also Bright,* 526 N.Y.S.2d at 72, 520 N.E.2d at 1361. It is a large, multipurpose complex that, in addition to transportation, houses numerous shops, restaurants, bars, and public facilities. Moreover, the multiple street entrances to the Station make it very difficult, if not impossible, to truly separate the Station from the other public areas in the surrounding neighborhood. *Cf. New Jersey*

*Coalition Against War in the Middle East v. J.M.B. Realty Corp.,* 138 N.J. 326, 650 A.2d 757, 778–79 (1994) (discussing the changing social and institutional role of shopping malls).

The testimony of a number of witnesses confirmed that Amtrak police regularly arrest or eject homeless and dishevelled people from Penn Station without so much as an explanation of what these people were doing wrong. This testimony was to the effect that the involved individuals were arrested or ejected solely because Amtrak police officers perceived that they were homeless or associating with the homeless. Amtrak contends that many of these people were ejected because they had been hanging around in the station for too long. However, for a constitutionally protected freedom to move about in the public areas of one's locale to be at all meaningful, this is the very sort of rationale for police conduct that must be disallowed.

D. Whether Amtrak Police Can Arrest a Person When there is No Evidence That That Person Has Committed or is Committing a Crime.

The petitioner in *Thompson v. City of Louisville,* 362 U.S. 199, 199–201, & n. 3, 80 S.Ct. 624, 624–626 & n. 3, 4 L.Ed.2d 654 (1960), was a long-term Louisville, Kentucky resident who was arrested when he was simply waiting in a local cafe. The cafe sold both food and beer. Thompson was on the dance floor dancing by himself when two police officers arrived on a "routine check." When one officer inquired of the cafe's manager, the latter told him that Thompson had been in the cafe for just over thirty minutes, although he had not purchased anything. However, at trial the manager acknowledged that Thompson could have been served something without the manager's noticing. After conversing with the manager, the officer approached Thompson and asked him for his reason for being in the cafe. Thompson responded he was waiting for a bus home. The officer then arrested Thompson for loitering. When, according to the police, Thompson then became argumentative, they added a charge of disorderly conduct.

In finding that Thompson's conviction on both charges violated the Due Process Clause of the Fourteenth Amendment, the Supreme Court relied on the lack of any evidence in the record that Thompson had committed any crime.[2] With regard to the loitering charge, the Court concluded that under the Kentucky statute Thompson could only have been convicted for having failed to provide a satisfactory account of himself. *Id.* at 204, 80 S.Ct. at 628. The record revealed that Thompson had told the police he was waiting for a bus. Moreover, the cafe manager testified that Thompson was a regular patron who was welcome at the cafe. *Id.* at 201, 205, 80 S.Ct. at 626, 628. The manager testified further that he did not, on the night of Thompson's arrest, object to Thompson's presence, and that Thompson, in fact, had done nothing objectionable. *Id.* at 205, 80 S.Ct. at 628. Thus, the Court concluded that the loitering charge was void. *Id.*

Similarly, the Court found no evidence to support the charge of disorderly conduct. This conviction had been based solely on the police officer's assertion that Thompson became argumentative when arrested for loitering. *Id.* The only evidence in the record was that Thompson had simply asked why he was being arrested. *Id.* at 206, 80 S.Ct. at 629. Again, the conviction was dismissed as void. *Id.*

In one of the Supreme Court's lunch counter cases, *Garner v. Louisiana,* 368 U.S. 157, 159–61, 82 S.Ct. 248, 249–50, 7 L.Ed.2d 207 (1961), petitioners, who were African–American university students, were convicted of disturbing the peace because they had refused to leave "whites only" lunch counters. These convictions rested solely upon the petitioners' "mere presence" at these counters. *Id.* at 171, 82 S.Ct. at 255. In overturning these convictions, the Supreme Court held that the *Thompson* no-evidence rule applied to the arresting officers, as well as to the courts:

The undisputed evidence shows that the police who arrested the petitioners were left with nothing to support their actions except their own opinions that it was a breach of the peace for the petitioners to sit peacefully in a place where custom decreed they should not sit. Such activity, in the circumstances of these cases, is not evidence of any crime and cannot be so considered either by the police or by the courts. *Id.* at 174, 82 S.Ct. at 257 (footnote omitted).

In the instant case, a number of witnesses testified that they were arrested or ejected from public areas of Penn Station without being questioned or even offered an explanation of how they had violated Amtrak's Rules of Conduct. Under the standard articulated in *Thompson* and *Garner,* this sort of conduct by the Amtrak police violates the Due Process Clause of the Fourteenth Amendment. Viewed another way, what the Plaintiffs are seeking to establish is their right to simply be present in a facility to which the public is given a fairly open invitation without being confronted by the Amtrak police. It seems clear that they have this right. It is inherent in "the right to be let alone—the most comprehensive of rights and the right most valued by civilized [people]." *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

**V. Sufficiently Serious Questions Going to the Merits to Make Them a Fair Ground for Litigation and a Balance of Hardships Tipping Decidedly Toward the Party Requesting the Preliminary Relief.**

The fair-ground-for-litigation standard, in determining whether to issue a preliminary injunction, is less rigorous than the likelihood-of-success test. *See Plaza Health Lab., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir. 1989); *Union Carbide Agric. Products Co. v. Costle,* 632 F.2d 1014, 1017–18 (2d Cir.1980),

---

**2.** Nineteen years later, the Court concluded that the "no evidence" standard articulated in *Thompson* was "simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 320, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The Court concluded that a petitioner seeking habeas corpus review is entitled to "relief if it is found that upon the record adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324, 99 S.Ct. at 2791–92.

*cert. denied,* 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981); *United States v. Siemens Corp.,* 621 F.2d 499, 506 (2d Cir.1980); *Medical Society of the State of New York v. Toia,* 560 F.2d 535, 538 (2d Cir.1977). As discussed above, Plaintiffs have shown a likelihood of success on the merits on four principal issues. First, Amtrak has extended a sufficiently broad invitation to the public to use Penn Station to implicate the strictures of the Due Process Clause of the Fourteenth Amendment. Second, Amtrak's Rules of Conduct are void for vagueness. Third, enforcement of these vague rules infringes upon Plaintiffs' fundamental freedom of movement. Fourth, enforcement also results in Amtrak police violating due process by arresting or ejecting individuals when there is no evidence that those individuals have committed any crimes. Thus, it follows that Plaintiffs have made an adequate showing under the less demanding fair-ground-for-litigation standard.

Turning to the balance of hardships, it is quite evident that this balance tips most decidedly in favor of the Plaintiffs. Penn Station is one of the principal points of rail transit access in the New York metropolitan area. For many travellers, it is effectively the only such point of access for some of Amtrak's most important national routes. Given this fact, it is difficult to imagine that a preliminary injunction restraining Amtrak's present practice of arresting or ejecting homeless persons from Penn Station would lead to even a minimal loss of revenue for Amtrak.

Defendants note that in weighing the hardships, the court must consider the impact of its decision on the public interest. *See Long Island R.R. v. International Ass'n of Machinists,* 874 F.2d 901, 910 (2d Cir.1989) ("In making the determination of irreparable harm, both harm to the parties and to the public may be considered."), *cert. denied,* 493 U.S. 1042, 110 S.Ct. 836, 107 L.Ed.2d 831 (1990); *Union Carbide,* 632 F.2d at 1017 (noting "that interim injunctive relief is an extraordinary and drastic remedy which should not be routinely granted, particularly if the grant may adversely affect the public interest"). Defendants suggest that a pre-liminary injunction in this case would interfere with the public's interest in having a safe and comfortable transportation facility. In other words, Defendants contend that the court should either concur in their labeling of the homeless as a criminal class or give weight to a perceived public interest in avoiding the aesthetic discomfort of being reminded on a daily basis that many of our fellow citizens are forced to live in abject and degrading poverty. The court cannot endorse either of these proposals.

While Defendants have not shown that a preliminary injunction would subject them to any significant hardship, Plaintiffs have established that the lack of such relief would leave them exposed to a continuous risk of violations of their most basic constitutional rights as equal members of the American community. Thus, the balance of hardships in this case tips most decidedly in favor of Plaintiffs. They have established their entitlement to interim relief.

## VI. Limitations on the Injunction to be Issued.

At this early stage in the litigation, the court is prepared to grant only limited relief. Accordingly, today's injunction is limited to prohibiting Defendants from arresting or ejecting persons who are merely present in the public areas of Penn Station, there being no evidence that such persons have committed or are committing any crimes. The injunction does not sanction sleeping in Penn Station; sitting without a ticket in areas that are now clearly marked as reserved for ticketed passengers; or loitering in private restaurants or other private businesses within Penn Station.

Plaintiffs have raised two additional challenges to Defendants' Rules of Conduct. First, Plaintiffs assert that these Rules are enforced in a racially discriminatory fashion. In support of this contention, Plaintiffs point to witnesses' testimony that Amtrak is more vigorous in applying its ejection policy against minorities than against whites. However, testimony from some of these same witnesses shows that whites who look dishevelled have also been ousted. Thus, the only discrimination shown is discrimination

against people who are dishevelled and look homeless. The evidence of racial discrimination at this stage of the litigation is simply insufficient to warrant injunctive relief on this ground.

Second, Plaintiffs allege that Defendants employ unreasonable or excessive force in carrying out ejections and arrests. In the course of the hearing on the motion for a preliminary injunction, the court ruled that at this stage Plaintiffs would have an opportunity to make a *prima facie* case on this issue. If the court found that Plaintiffs had succeeded in making out a *prima facie* case as to the use of excessive force in making a particular arrest, Defendants would be given the opportunity to present their evidence on this issue at a future hearing or at trial. (R. at 784–86.)

To establish a *prima facie* case, Plaintiffs must present "evidence of an amount and quality sufficient to send [an issue] to the trier of fact." *SEC v. Unifund SAL,* 910 F.2d 1028, 1037 (2d Cir.1990). In support of their claim, Plaintiffs offer testimony from homeless individuals, StreetWatch volunteers, and others regarding incidents in which other individuals, in the main, were punched, shoved or struck with batons, shoved against walls or pillars, thrown to the ground, kicked, maced, dragged, beaten, or otherwise physically accosted by Amtrak police. This testimony is sufficient to meet the threshold for a *prima facie* case as to specifically identified individuals. However, until Defendants have had an opportunity for rebuttal, the court cannot offer injunctive relief on this issue.

## CONCLUSION

For all of the above reasons, Plaintiffs' motion for a preliminary injunction is granted. The Plaintiffs are to submit a proposed order no later than ten days from the effective date of this opinion and accompanying order.