**HUBBARD BROADCASTING, INC., a Minnesota corporation, Appellee,**

v.

**METROPOLITAN SPORTS FACILITIES COMMISSION, a public body; and American Sign and Indicator Corporation, a Washington corporation; and Twin City Federal Savings and Loan Association, a Minnesota corporation, and American Sign and Indicator Corporation/Twin City Federal Savings & Loan Association, a joint venture, Appellants.**

**HUBBARD BROADCASTING, INC., a Minnesota corporation, Appellee,**

v.

**METROPOLITAN SPORTS FACILITIES COMMISSION, a public body, Appellant,**

**and American Sign and Indicator Corporation, a Washington corporation; and Twin City Federal Savings and Loan Association, a Minnesota corporation, and American Sign and Indicator Corporation/Twin City Federal Savings & Loan Association, a joint venture.**

**HUBBARD BROADCASTING, INC., a Minnesota corporation, Appellant,**

v.

**METROPOLITAN SPORTS FACILITIES COMMISSION, a public body; and American Sign and Indicator Corporation, a Washington corporation; and Twin City Federal Savings and Loan Association, a Minnesota corporation, and American Sign and Indicator Corporation/Twin City Federal Savings & Loan Association, a joint venture, Appellees.**

Nos. 85–5006, 85–5011 and 85–5014.

United States Court of Appeals, Eighth Circuit.

Submitted June 12, 1985.

Decided July 8, 1986.

David R. Knodell, and Stephen P. Kelley, Minneapolis, Minn., for Hubbard Broadcasting Inc.

Sidney Barrows, Minneapolis, Minn., for appellee.

Before McMILLIAN and FAGG, Circuit Judges, and WOODS,* District Judge.

FAGG, Circuit Judge.

Hubbard Broadcasting, Inc. (Hubbard), a radio and television broadcaster in the Twin Cities area, appeals the district court's dismissal of its constitutional claims against Metropolitan Sports Facilities Commission (Commission) and others. Hubbard claims that these defendants violated its free speech and equal protection rights by granting its competitor, Midwest Radio and Television, Inc. (Midwest), an exclusive right to advertise on the scoreboard at the Hubert H. Humphrey Metrodome in Minneapolis, Minnesota. We affirm.

In order to provide a facility for major sporting events in the Twin Cities, the Commission authorized construction of the Metrodome. Agreements for use of the Metrodome between the Commission and the two professional sports teams in the area, the Minnesota Twins and the Minnesota Vikings, required a scoreboard system.

Appropriations for construction of the Metrodome, however, did not include funding for a scoreboard system. The Commission learned that several cities with similar sports facilities had financed the construction of a scoreboard system through advertising contracts. Thus, the Commission decided to explore the possibility of obtaining a scoreboard system for the Metrodome at little or no cost to the city by selling advertising space.

---

* The HONORABLE HENRY WOODS, United States District Judge for the Eastern District of Arkansas, sitting by designation.

American Sign and Indicator Corporation (ASI) manufactures scoreboard systems and markets display advertising on scoreboard panels for stadiums and sports arenas throughout the country. Twin City Federal Savings and Loan Association (TCF) formed a joint venture with ASI (ASI/TCF) in an effort to obtain the exclusive right to market advertising in the Metrodome.

In January of 1981, the Commission entered into a Scoreboard System Agreement with ASI/TCF to finance the construction of a scoreboard system at the Metrodome. Under its terms, the Commission granted ASI/TCF the exclusive right to sell all advertising space on the scoreboard for ten years, and ASI/TCF agreed to provide the scoreboard system. The Commission further agreed not to allow any advertising within the Metrodome that would directly compete with the scoreboard advertising. The Commission and ASI/TCF were to share in the revenue generated from the advertising contracts, and title to the scoreboard passes automatically to the Commission after the fifteenth year.

In order to generate the maximum amount of revenue from the limited advertising space available on the scoreboard, ASI/TCF established product categories and sold exclusive advertising contracts to one advertiser within each product category for a ten-year period. The advertising contracts were sold on a first-come/first-served basis.

In the spring of 1982, an ASI/TCF representative sold an exclusive ten-year advertising contract to Midwest. Hubbard then demanded an opportunity to compete for the scoreboard advertising or advertising elsewhere in the Metrodome. The Commission refused Hubbard's demand based on the exclusive advertising provision in the Scoreboard System Agreement.

Hubbard filed this action, claiming (1) the exclusive advertising concept under the Scoreboard System Agreement deprived Hubbard of its rights to free speech and equal protection; (2) the Commission and other named defendants had unreasonably restrained competition for stadium advertising in violation of state and federal antitrust laws; and (3) the Scoreboard System Agreement was void under state law because it violates Minnesota's public bidding laws and because it unlawfully delegates authority to sell or lease advertising space in the Metrodome.

The district court granted the defendants' motions for summary judgments against Hubbard on its unlawful delegation claim, its first amendment claim, and its equal protection claim. The district court, however, granted summary judgment in favor of Hubbard on its public bidding claim. The antitrust claims were voluntarily dismissed upon consent of the parties.

On appeal, we certified the state law issues of public bidding and unlawful delegation to the Minnesota Supreme Court under Minn.Stat. § 480.061. *Hubbard Broadcasting, Inc. v. Metropolitan Sports Facilities Commission,* Nos. 85–5006, 85–5011, 85–5014 (8th Cir.1985) (order for certification). The Minnesota Supreme Court decided both issues against Hubbard and upheld the validity of the Scoreboard System Agreement under Minnesota state law. *Hubbard Broadcasting, Inc. v. Metropolitan Sports Facilities Commission,* 381 N.W.2d 842 (Minn.1986). These issues are res judicata to the parties and are no longer before us. *See* Minn.Stat. § 480.061(7).

Hence, the only issue left for purposes of this appeal is Hubbard's constitutional challenge to the exclusive advertising concept. In order to make a proper determination, our analysis must begin with a consideration of the government property involved and its intended use.

Recognizing that the Government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated," the Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. Accordingly, the extent to which the Government can control access depends on the nature of

the relevant forum. Because a principal purpose of traditional public fora is the free exchange of ideas, speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. Similarly, when the Government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling governmental interest. Access to a nonpublic forum, however, can be restricted as long as the restrictions are "reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view."

*Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* — U.S. —, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985) (citations omitted).

■ Hubbard claims that by selling advertising space within the Metrodome, the Commission has designated the stadium as a public forum for commercial speech. We disagree.

"Not every instrumentality used for communication, however, is * * * a public forum by designation." 105 S.Ct. at 3450. A public forum is not created when the government permits limited discourse, "but only by intentionally opening a non-traditional forum for public discourse." *Id.* at 3449. In making this determination, the court may appropriately consider the nature of the property, its compatibility with the expressive activity that is being restricted, and the government's policy and practice to ascertain whether it intended to designate a public forum. *Id.*

Initially, we doubt seriously whether the Metrodome, as a whole, is indeed a public forum. The Commission was established to provide sports facilities in the metropolitan area. *See* Minn.Stat. § 473.552. As a direct result of the Metropolitan Sports Facilities Act, Minn.Stat. § 473.551 *et seq.*, the Commission authorized construction of the Metrodome. *See generally Minnesota Vikings Football Club, Inc. v. Metropolitan Council,* 289 N.W.2d 426 (Minn.1979).

From the outset, the Commission intended the Metrodome to be a sports complex. The Metrodome is not a place of public assembly intended for the communication of ideas or for the exchange of different points of view. Rather, it is a commercial venture by the city constructed to meet the need for a major sports facility in the Twin Cities area and, at the same time, to provide economic benefits to the area. It follows that the Metrodome does not come within the scope of a traditional public forum. *See, e.g., International Society for Krishna Consciousness, Inc. v. New Jersey Sports and Exposition Authority,* 691 F.2d 155, 159–61 (3d Cir.1982) (Based on a similar analysis, the Third Circuit held that the Meadowlands Sports Complex in New Jersey was not a public forum.).

■ We find the issue, however, to be more circumscribed than Hubbard has framed it. Hubbard does not seek general access to the Metrodome but rather limited access in the form of advertising space within the Metrodome. "In cases in which limited access is sought, [the Court has] taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property." *Cornelius,* 105 S.Ct. at 3449. Thus, the crucial question is not whether the Metrodome, as a whole, is a public forum but whether the Commission designated advertising space within the Metrodome a public forum.

The Supreme Court in *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), considered a similar issue to the one before us. There, advertising space on the city's transit system was managed by a private company called Metromedia. Under contract with the city, Metromedia could not sell any space on its transit system for political advertising. A candidate for political office who desired to purchase advertising space to promote his candidacy challenged the constitutionality of the policy.

Recognizing that the city was engaged in commerce in providing commuter service to the residents of Shaker Heights, the Court held that the advertising space on the city's

buses did not constitute a public forum. "The [advertising] space * * * is a part of the commercial venture." *Id.* at 303, 94 S.Ct. at 2717. The Court observed that the "[r]evenue earned from long-term commercial advertising could be jeopardized by a requirement that short-term candidacy or issue-oriented advertisements be displayed on car cards." *Id.* at 304, 94 S.Ct. at 2717. Thus, "[i]n cases where the principal function of the property would be disrupted by expressive activity, the Court is particularly reluctant to hold that the Government intended to designate a public forum." *Cornelius*, 105 S.Ct. at 3450; *see also International Society*, 691 F.2d at 160–61.

Here, as in *Lehman*, the city is engaged in commerce. In order to finance the construction of a scoreboard system within the Metrodome, the Commission proposed to sell advertising space within the stadium. ASI/TCF agreed to provide the funding to construct the scoreboard system in return for the exclusive right to sell the advertising space available on the scoreboard.

Under these circumstances, we find that the city did not intend to designate a public forum by selling advertising space on the scoreboard. Hubbard's claim, taken to its logical extreme, would allow anyone who desired to advertise his product on the scoreboard a first amendment right to do so. No doubt the principal function of the Metrodome would be disrupted by the volume of the expressive activity alone. When, as here, the city, acting in a proprietary capacity, has allowed a small number of commercial advertisers access to a limited amount of advertising space on government property in order to generate revenue, the city has not created a public forum.

Our inquiry, however, does not end here. We must now determine whether the restrictions on the commercial speech involved here are reasonable and content-neutral. *See, e.g., Cornelius*, 105 S.Ct. at 3451; *International Society*, 691 F.2d at 160.

■ ASI/TCF decided that the most effective way to raise revenue from advertising on the scoreboard within the Metrodome was to sell exclusive ten-year contracts in designated product categories on a first-come/first-served basis. Furthermore, ASI/TCF determined that the exclusive advertising contracts would be more valuable if no competitor were allowed advertising space elsewhere in the Metrodome. This managerial decision to limit access to the advertising space was based upon a reasonable objective to promote revenue. By promoting revenue, the Commission could assure the acquisition of a scoreboard system required under the use agreements with the professional sports teams. *See Lehman*, 418 U.S. at 304, 94 S.Ct. at 2717.

Furthermore, we conclude that the policy is content-neutral. Here, no effort was made to suppress a particular point of view. Hubbard was not denied access to the advertising space because of the content of its advertisements. Rather, Hubbard was rejected simply because it failed to bid for the advertising space before Midwest. "The method of allocating space is a straightforward first-come, first-served system." *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 649, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981). It follows that the policy was not designed to suppress any particular point of view.

■ Hubbard also claims that its equal protection rights were violated by the exclusive advertising concept. We disagree. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Texas v. Cleburne Living Center*, —— U.S. ——, ——, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)).

Here, although Hubbard and Midwest are similarly situated, the first-come/first-served policy under the exclusive advertising concept does not discriminate against either broadcaster. In other words, Hub-

bard does not contend that if it had bid for the exclusive advertising contract before Midwest on identical terms, Hubbard would have been rejected. Nor does Hubbard argue that ASI/TCF should have contacted Hubbard before making a proposal to Midwest.

Although Hubbard complains that it was denied an opportunity to make its bid for the advertising contract before Midwest's bid was accepted, this fact alone does not change our analysis. Very simply, an ASI/TCF representative first made its proposal to Midwest's officials and Midwest accepted the advertising package that was offered. Thus, ASI/TCF adhered to its policy of granting the exclusive advertising contracts on a first-come/first-served basis. Under these circumstances, we can find no equal protection violation.

Accordingly, the decision of the district court dismissing Hubbard's constitutional claims is affirmed. In accordance with the decision by the Minnesota Supreme Court on certification of issues of state law, we affirm the district court's dismissal of Hubbard's unlawful delegation claim and reverse the district court's judgment in favor of Hubbard on its public bidding claim.