69 F.3d 650
 64 USLW 2291
 Michael A. LEBRON, Plaintiff-Counter-Defendant-Appellee,
v.
NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK), Defendant-Appellant,
and
Transportation Displays, Incorporated, Defendant-Counter-Claimant.
 No. 1494, Docket 93-7127.
 United States Court of Appeals,
 Second Circuit.
Argued April 27, 1993.
Decided Dec. 27, 1993.
Reversed and Remanded Feb. 21, 1995.
Reargued May 11, 1995.
Decided Oct. 30, 1995.
 
 Kevin T. Baine, Washington, D.C. (Nicole K. Seligman, Steven M. Farina, Williams & Connolly, Washington, D.C., William G. Ballaine, Mark S. Landman, Siff Rosen P.C., New York City (of counsel), for Defendant-Appellant.
 David D. Cole, Washington, D.C. (Center for Constitutional Rights, Washington, D.C., R. Bruce Rich, Gloria C. Phares, Robin E. Silverman, Bernadette M. McCann Ezring, Jonathan Bloom, Weil, Gotshal & Manges, New York City, of counsel), for Plaintiff-Counter-Defendant-Appellee.
 Before: NEWMAN, Chief Judge, and LUMBARD and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 On remand from the United States Supreme Court, see Lebron v. National R.R. Passenger Corp., --- U.S. ----, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995) ("Lebron III"), this appeal of a judgment entered February 11, 1993 in the United States District Court for the Southern District of New York, Pierre N. Leval, then-District Judge,* again comes before us. The district court enjoined defendant-appellee National Railroad Passenger Corporation ("Amtrak") and defendant-counter-claimant Transportation Displays, Incorporated ("TDI") to display a political advertisement prepared by plaintiff-counter-defendant-appellee Michael A. Lebron on a large billboard known as the Spectacular in New York City's Pennsylvania Station ("Penn Station"), having determined that Amtrak's failure to do so violated the First Amendment. See Lebron v. National R.R. Passenger Corp. (AMTRAK), 811 F.Supp. 993 (S.D.N.Y.1993) ("Lebron I").
 
 
 2
 On appeal, after staying the injunction, we reversed the judgment of the district court, "conclud[ing] that Amtrak is not a governmental actor subject to the strictures of the First Amendment." Lebron v. National R.R. Passenger Corp. (AMTRAK), 12 F.3d 388, 389 (2d Cir.1993) ("Lebron II"). The Supreme Court reversed and remanded, holding that Amtrak "is part of the Government for purposes of the First Amendment," Lebron III, --- U.S. at ---- - ----, 115 S.Ct. at 974-75, but "express[ing] no opinion as to whether Amtrak's refusal to display Lebron's advertisement violated that Amendment." Id. at ----, 115 S.Ct. at 975.
 
 
 3
 Because we conclude that Amtrak's historical refusal to accept political advertisements such as Lebron's on the Spectacular is a reasonable use of that forum that is neutral as to viewpoint, and that Lebron lacks standing to assert a facial challenge to Amtrak's general policies concerning the acceptance of advertising for display at Pennsylvania Station, we again reverse the judgment of the district court.
 
 Background
 
 4
 On November 30, 1992, Lebron, an artist who creates political billboard displays (frequently involving commentary on public issues), and TDI, which manages the leasing of advertising space for Amtrak, entered into a leasing agreement (the "Lease") under which Lebron would rent the Spectacular, "a curved back-lit display space approximately 103 feet wide by ten feet high ... [which] dominates the west wall of the rotunda on the upper level of Penn Station where thousands of passengers pass each day," for the months of January and February 1993. Lebron II, 12 F.3d at 389. Although Lebron did not specify the precise nature of his display, he did inform TDI that his work was generally political. Id. By the terms of the Lease, " '[a]ll advertising copy is subject to approval of TDI and [Amtrak] as to character, text, illustration, design and operation.... [I]f [Amtrak] should deem such advertising objectionable for any reason, TDI shall have the right to terminate the contract and discontinue the service without notice.' " Id. (quoting the Lease, alterations partially added).
 
 
 5
 Lebron then submitted his proposed advertisement (the "Display") to TDI. Lebron characterizes the Display as "an allegory about the destructive influence of a powerful, urban, materialistic and individualistic culture on rural, community based, family-oriented and religious cultures." The district court described the Display as follows:
 
 
 6
 The work is a photomontage, accompanied by considerable text. Taking off on a widely circulated Coors beer advertisement which proclaims Coors to be the "Right Beer," Lebron's piece is captioned "Is it the Right's Beer Now?" It includes photographic images of convivial drinkers of Coors beer, juxtaposed with a Nicaraguan village scene in which peasants are menaced by a can of Coors that hurtles towards them, leaving behind a tail of fire, as if it were a missile. The accompanying text, appearing on either end of the montage, criticizes the Coors family for its support of right-wing causes, particularly the contras in Nicaragua. Again taking off on Coors' advertising which uses the slogan of "Silver Bullet" for its beer cans, the text proclaims that Coors is "The Silver Bullet that aims The Far Right's political agenda at the heart of America."
 
 
 7
 Lebron I, 811 F.Supp. at 995.
 
 
 8
 When TDI saw the Display, it offered Lebron any of 500 alternative billboard sites that TDI had available in New York City (none of which were in Penn Station), but Lebron rejected this offer. Echoing the allegation in his complaint that the Spectacular is "a unique advertising location in the City of New York," Lebron stated in an affidavit that:
 
 
 9
 The very size of the Spectacular allowed me to design and visualize this work with an effectiveness and clarity that would have been otherwise impossible to achieve. Its size and shape make it one of the largest advertising display spaces in New York City, and its prominent location in Pennsylvania Station means that it is visible to a large segment of the traveling public, providing an excellent opportunity to reach exactly the kind of audience I hope to engage with the subject matter of this piece. For all of these reasons, I consider the space an extraordinarily unique advertising location in New York City, and a unique challenge to my communicative skills as an artist that no gallery and few other public environments could provide.
 
 
 10
 Shortly thereafter, Amtrak rejected the Display, stating that its " 'policy is that it will not allow political advertising on the [S]pectacular advertising sign.' " Lebron II, 12 F.3d at 389 (quoting Amtrak rejection letter, alteration in Lebron II ).
 
 
 11
 This policy, however, is not committed to writing, Lebron I, 811 F.Supp. at 1001, although the licensing agreement between Amtrak and TDI (which is addressed to all of Amtrak's advertising space) states that: " 'All advertising material, exhibit material, notices and advertisements, and their manner of presentation and design, shall be subject to approval by Amtrak, which may disapprove any such items at its own discretion.' " Id. at 1002 (quoting licensing agreement).[1] In addition, the licensing agreement provides that public service announcements may be accepted, at a reduced rate and when space is available, although they may be preempted by commercial advertising. Id. at 1003. Public service advertisements may be accepted only from " 'recognized, legitimate [tax exempt] not-for-profit organizations, corporations, National, State or Local government agencies and subdivisions, philanthropic or cultural organizations whose activities would be of interest or benefit to a majority of the area population,' " and must "adhere to 'good taste, decency and community standards.' " Id. (quoting licensing agreement, alterations in Lebron I ).
 
 
 12
 In this regard, Amtrak has leased advertising space to various noncommercial groups, including:
 
 
 13
 the New York Department of the Environment, the New York Department of Commerce, a foundation for muscular dystrophy, and Plain Truth Magazine, a free magazine on political and social issues published by The Worldwide Church of God. In addition, testimony of the general counsel of TDI indicates that TDI regularly displays public service advertisements, including subjects such as the homeless, the environment, drunk driving, AIDS awareness, health issues, and race relations.
 
 
 14
 Id. at 1004. The Plain Truth is distributed at a four-sided, seven-foot kiosk that displays an advertisement for the magazine and is located in front of the Spectacular.
 
 
 15
 In addition, however, it is undisputed that in the twenty-six years of its existence, the Spectacular has never been used for any type of advertising other than commercial promotions. The only advertisements that have appeared on the Spectacular have promoted DuPont Company, Resorts International in Atlantic City, the Broadway play "Sophisticated Ladies," Fujitsu Computers, Nike athletic wear, and A & S Department Stores.[2] Moreover, as Lebron has acknowledged, Amtrak previews proposed advertisements for the Spectacular, while it views advertisements to be used at other locations only after they are exhibited.
 
 
 16
 Lebron commenced this action alleging a violation of his First Amendment rights and breach of contract, and seeking equitable relief or, alternatively, damages. The district court granted a mandatory injunction requiring Amtrak and TDI to exhibit the Display on the Spectacular. Lebron I, 811 F.Supp. at 1005. After holding that Amtrak is a government actor subject to the First Amendment, id. at 995-1000, the court concluded that Amtrak's refusal to exhibit the Display violated that amendment. Id. at 1000-05. The court provided four bases for this determination: (1) Amtrak's policy of not accepting political advertisements is not clearly set forth, in that it is not reduced to writing, id. at 1001-02; (2) the policy is vague, in that it is difficult to draw the line between political, public interest, and commercial advertisements, as demonstrated by conflicting testimony by Amtrak's officials, id. at 1002-03; (3) the policy is not consistently applied, in that certain public service advertisements that Amtrak has accepted might be viewed as political, id. at 1003-04; and (4) the policy may be void as discriminating on the basis of viewpoint, in that Amtrak may inquire into whether a particular advertisement is offensive, id. at 1004-05.
 
 
 17
 As previously stated, we initially reversed on the ground that Amtrak is not subject to First Amendment constraints, and therefore did not consider the merits of Lebron's First Amendment claim. Lebron II, 12 F.3d at 392. We instructed the district court not to exercise supplemental jurisdiction over the remaining state law claim, but noted that Lebron would be free to pursue that claim in state court. Id. at 392-93. The Supreme Court reversed and remanded on the "government actor" issue, directing us to consider the merits of Lebron's First Amendment claim. Lebron III, --- U.S. at ---- - ----, 115 S.Ct. at 974-75.
 
 
 18
 We requested supplemental letter briefs from the parties, and heard reargument on the First Amendment issues.
 
 Discussion
 
 19
 Because Lebron seeks access to government property, we begin with a review of the public forum doctrine.
 
 
 20
 Under this approach, regulation of speech on government property that has traditionally been available for public expression is subject to the highest scrutiny. Such regulations survive only if they are narrowly drawn to achieve a compelling state interest. Perry [Educ. Ass'n v. Perry Local Educators' Ass'n], 460 U.S. [37,] 45, 103 S.Ct. [948,] 955 [74 L.Ed.2d 794] [ (1983) ]. The second category of public property is the designated public forum, whether of a limited or unlimited character--property that the state has opened for expressive activity by part or all of the public. Ibid. Regulation of such property is subject to the same limitations as that governing a traditional public forum. Id., at 46, 103 S.Ct., at 955. Finally, there is all remaining public property. Limitations on expressive activity conducted on this last category of property must survive only a much more limited review. The challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view. Ibid.
 
 
 21
 International Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, ----, 112 S.Ct. 2701, 2705-06, 120 L.Ed.2d 541 (1992). Reasonable, content-neutral time, place, or manner restrictions are permissible in a public forum. See Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753-54, 105 L.Ed.2d 661 (1989).
 
 
 22
 "[I]n defining the forum [the Supreme Court has] focused on the access sought by the speaker.... In cases in which limited access is sought, [the Court's] cases have taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property." Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 801, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985) (emphasis added) (holding that federal fund-raising drive, not federal workplace generally, was relevant forum for analysis).
 
 
 23
 Amtrak contends that our public forum inquiry must focus on the Spectacular alone, rather than all Penn Station advertising space. We agree. Because of its unique size, location, and visibility, Lebron sought access only to the Spectacular, and refused to accept any other advertising space in New York City managed by TDI. Although Lebron now contends that we should broaden our public forum inquiry to all Penn Station advertising space, it was he who determined that only the Spectacular would be acceptable for his display. Cf. Air Line Pilots Ass'n, Int'l v. Department of Aviation, 45 F.3d 1144, 1151-52 (7th Cir.1995) (where speaker seeks access to diorama display cases in airport, public forum inquiry focuses on display cases rather than airport as a whole); Hubbard Broadcasting, Inc. v. Metropolitan Sports Facilities Comm'n, 797 F.2d 552, 555-56 (8th Cir.) (where speaker seeks access to advertising space in sports arena, public forum inquiry focuses on advertising space rather than entire arena), cert. denied, 479 U.S. 986, 107 S.Ct. 576, 93 L.Ed.2d 579 (1986).
 
 
 24
 To determine the Spectacular's forum category, we must examine "the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449. We must bear in mind that "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." Id.; see also Krishna, 505 U.S. at ----, 112 S.Ct. at 2706 (quoting Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449). Thus, even when the government opens a forum for some speech, the forum does not become a public forum if the government did not intend to open the forum without limitation. See United States v. Kokinda, 497 U.S. 720, 730, 110 S.Ct. 3115, 3121-22, 111 L.Ed.2d 571 (1990) (plurality opinion); Perry Educ. Ass'n v. Perry Local Educators Ass'n, 460 U.S. 37, 48, 103 S.Ct. 948, 956-57, 74 L.Ed.2d 794 (1983). When only some First Amendment access has been granted, the reasonableness test applies. Kokinda, 497 U.S. at 730, 110 S.Ct. at 3121-22 (plurality opinion); Perry, 460 U.S. at 49, 103 S.Ct. at 957.
 
 
 25
 Although Amtrak does not maintain a written policy with respect to the Spectacular, its practice is clear; it has never opened the Spectacular for anything except purely commercial advertising. See Air Line Pilots Ass'n, 45 F.3d at 1154 ("a court must examine the actual policy--as gleaned from the consistent practice with regard to various speakers--to determine whether a state intended to create a designated public forum"); cf. AIDS Action Comm. v. Massachusetts Bay Transp. Auth., 42 F.3d 1, 10-12 (1st Cir.1994) (prohibiting advertisements concerning use of condoms pursuant to written policy prohibiting sexually explicit advertisements constituted "discrimination in the application of supposedly neutral standards" when other sexually explicit advertisements had been allowed).
 
 
 26
 In light of Amtrak's undisputed practice with respect to the Spectacular, therefore, we conclude that the Spectacular is not a public forum; most likely, it is a non-public forum, or perhaps it is a limited public forum opened for purely commercial speech. See Calash v. City of Bridgeport, 788 F.2d 80, 83-84 (2d Cir.1986) (sports arena opened only to civic, charitable, and nonprofit groups either a nonpublic forum or a limited public forum not required to accommodate other members of general public).
 
 
 27
 Accordingly, Amtrak's policy of excluding noncommercial advertisements from the Spectacular will be upheld so long as the policy is "viewpoint-neutral and reasonable in relation to the forum's purpose." Calash, 788 F.2d at 84; see also Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451 ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.").
 
 
 28
 Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), is particularly well addressed to this issue as presented in the instant case. In Lehman, the city imposed a ban on political advertisements in buses, but allowed other types of advertisements, including commercial and public service ads. A candidate for public office challenged this policy as a First Amendment violation, and the Court responded as follows:
 
 
 29
 Here, we have no open spaces, no meeting hall, park, street corner, or other public thoroughfare. Instead, the city is engaged in commerce. It must provide rapid, convenient, pleasant, and inexpensive service to the commuters of Shaker Heights. The car card space, although incidental to the provision of public transportation, is part of the commercial venture. In much the same way that a newspaper or periodical, or even a radio or television station, need not accept every proffer of advertising from the general public, a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles. In making these choices, this Court has held that a public utility "will be sustained in its protection of activities in public places when those activities do not interfere with the general public convenience, comfort and safety." Public Utilities Comm'n v. Pollak, 343 U.S. [451,] 464-65 [72 S.Ct. 813, 821-22, 96 L.Ed. 1068 [ (1952) ].
 
 
 30
 Because state action exists, however, the policies and practices governing access to the transit system's advertising space must not be arbitrary, capricious, or invidious.... Revenue earned from long-term commercial advertising could be jeopardized by a requirement that short-term candidacy or issue-oriented advertisements be displayed on car cards. Users would be subjected to the blare of political propaganda. There could be lurking doubts about favoritism, and sticky administrative problems might arise in parceling out limited space to eager politicians. In these circumstances, the managerial decision to limit car card space to innocuous and less controversial commercial and service oriented advertising does not rise to the dignity of a First Amendment violation....
 
 
 31
 No First Amendment forum is here to be found. The city consciously has limited access to its transit system advertising space in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience. These are reasonable legislative objectives advanced by the city in a proprietary capacity. In these circumstances, there is no First or Fourteenth Amendment violation.
 
 
 32
 Lehman, 418 U.S. at 303-04, 94 S.Ct. at 2717-18 (plurality opinion) (emphasis added).[3]
 
 
 33
 It is especially significant that, as in Lehman, Amtrak acts in this case in a proprietary capacity, rather than as a governmental regulator. As the Court stated in Krishna:
 
 
 34
 Where the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject. Kokinda, supra, 497 U.S., at , 110 S.Ct., at [3119] (plurality opinion) (citing Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961)). Thus, we have upheld a ban on political advertisements in city-operated transit vehicles, Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), even though the city permitted other types of advertising on those vehicles. Similarly, we have permitted a school district to limit access to an internal mail system used to communicate with teachers employed by the district. Perry Education Assn. v. Perry Local Educators' Ass'n, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).
 
 
 35
 505 U.S. at ----, 112 S.Ct. at 2705.
 
 
 36
 Amtrak's decision, as a proprietor, to decline to enter the political arena, even indirectly, by displaying political advertisements is certainly reasonable. Amtrak's position as a government controlled and financed public facility, used daily by thousands of people, made it highly advisable to avoid the criticism and the embarrassments of allowing any display seeming to favor any political view. This was particularly so with respect to the Spectacular in view of its uniqueness and size. Cf. Calash, 788 F.2d at 84 (finding the city's decision to limit access to sports arena to civic, charitable, and non-profit groups, but not rock musicians, reasonable) (citing Cornelius, 473 U.S. at 809-11, 105 S.Ct. at 3452-54); Perry, 460 U.S. at 50-53, 103 S.Ct. at 958-59; and Lehman, 418 U.S. at 304, 94 S.Ct. at 2718 (plurality opinion)). Nor would a policy against "political" advertising on the Spectacular be void for vagueness in light of the Supreme Court's decision in Lehman, 418 U.S. at 303-04, 94 S.Ct. at 2717-18 (plurality opinion).
 
 
 37
 Lebron urges us to reach the same conclusion as the district court, arguing that Amtrak's policy is unwritten, inconsistently applied, and possibly viewpoint biased. We disagree.
 
 
 38
 The fact that a policy is not committed to writing does not of itself constitute a First Amendment violation. Cf. City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 770, 108 S.Ct. 2138, 2151, 100 L.Ed.2d 771 (1988) ("[T]he limits the city claims are implicit in its law must be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice."). City of Lakewood and the other cases cited by the district court stand for the propositions that "in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship," id. at 757, 108 S.Ct. at 2144, and that "the absence of express standards makes it difficult to distinguish, 'as applied,' between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power." Id. at 758, 108 S.Ct. at 2144.
 
 
 39
 Neither of these concerns is implicated here. Amtrak's prior written agreements, together with the testimony of the Amtrak official responsible for approving advertisements on the Spectacular and Amtrak's historic practice of reserving the Spectacular for commercial advertisements, dispel the notion that Amtrak enjoyed "unbridled discretion" or could have perpetrated an "illegitimate abuse of censorial power" in rejecting an advertisement because of its political content. Furthermore, because the policy against political advertisements was limited in scope to the Spectacular, there is no evidence that Amtrak's policy has ever been applied inconsistently.
 
 
 40
 The district court also intimated that Amtrak's policy might be void for viewpoint bias, depending upon which of the conflicting versions offered at trial represented Amtrak's true policy. Although the district court entered no findings of fact, its concern was primarily based upon statements appearing in Amtrak's 1967 and 1980 agreements with TDI, which gave Amtrak the discretion to refuse any advertising that "involve[s] political or other views which could result in dissension or involve [Amtrak] in dissension, complaints or controversy with its patrons or the public." 811 F.Supp. at 1001-02 (quoting TDI licensing agreements) (alterations partly added). Of course, if such a policy were used to screen out only controversial political advertisements--that is, political advertisements distasteful to the majority--it would be void for viewpoint bias. On the other hand, it seems more sensible to read the language as a justification, however inartfully phrased, for a categorical ban against political advertising, see, e.g., Lehman, 418 U.S. at 304, 94 S.Ct. at 2718 (characterizing commercial advertising as "innocuous and less controversial" than political advertising), rather than as a test for discriminating against certain types of political advertisements.[4]
 
 
 41
 Because we have found that Amtrak's policy against political advertisements was limited in scope to the Spectacular, Lebron's attempt to attack Amtrak's policies regarding the acceptance of advertisements in Penn Station generally, rather than on the Spectacular, amounts, in substance, to a facial challenge to those policies as they might be applied to advertisements other than Lebron's and to locations not at issue. Ordinary rules of standing, of course, would bar Lebron from mounting such a challenge. As the Supreme Court has made clear: "Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." Broadrick v. Oklahoma, 413 U.S. 601, 610, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973) (collecting cases).
 
 
 42
 Further, "[t]he question of standing is not subject to waiver ...: 'we are required to address the issue even if the courts below have not passed on it, and even if the parties fail to raise the issue before us. The federal courts are under an independent obligation to examine their own jurisdiction, and standing "is perhaps the most important of [the jurisdictional] doctrines." ' " United States v. Hays, --- U.S. ----, ----, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995) (quoting FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 230-31, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990) (quoting Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984))) (alteration in FW/PBS ).
 
 
 43
 Broadrick also recognized, however, that "the Court has altered its traditional rules of standing to permit--in the First Amendment area--'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' " Id. 413 U.S. at 612, 93 S.Ct. at 2916 (quoting Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965)). Broadrick went on to emphasize that this overbreadth doctrine "has been employed by the Court sparingly and only as a last resort." Id. 413 U.S. at 613, 93 S.Ct. at 2916; see also Younger v. Harris, 401 U.S. 37, 52, 91 S.Ct. 746, 754, 27 L.Ed.2d 669 (1971) ("Procedures for testing the constitutionality of a statute 'on its face' ... are fundamentally at odds with the function of the federal courts in our constitutional plan.").
 
 
 44
 In our view, this case affords no occasion for application of the overbreadth doctrine, and Lebron accordingly lacks standing to assert a general challenge to Amtrak's advertising policies. The doctrine has only been applied to the conduct of the government in its role as a regulator, not as a proprietor. See e.g., City of Lakewood, 486 U.S. at 759-62, 108 S.Ct. at 2145 (newspaper permitted to mount facial challenge to ordinance that granted municipal mayor uncircumscribed authority to allow or disallow distribution of newspapers via newsracks on public streets); Board of Airport Comm'rs v. Jews for Jesus, Inc., 482 U.S. 569, 571, 574-77, 107 S.Ct. 2568, 2570, 2572-73, 96 L.Ed.2d 500 (1987) (allowing overbreadth challenge to ordinance that barred "First Amendment activities within the Central Terminal Area at Los Angeles International Airport"). It is invoked against a statute that " 'threatens others not before the court--those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid,' " id. at 574, 107 S.Ct. at 2572 (quoting Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 503, 105 S.Ct. 2794, 2802, 86 L.Ed.2d 394 (1985)), and invalidation of a statute on its face is permitted "only if the overbreadth is 'substantial.' " Id. (collecting cases).
 
 
 45
 Such concerns simply are not implicated by Amtrak's role as the proprietor of Penn Station, essentially seeking to derive revenues from the sale of advertising while minimizing interference with or disruption of the station's commercial function. See Lehman, 418 U.S. at 303, 94 S.Ct. at 2717 (plurality opinion). Thus, Lebron lacks standing to present a facial challenge to Amtrak's general advertising policies in this litigation. This would be so even if Lebron had adduced a stronger showing of erosion of Amtrak's policy against political advertisements than the handful of assertedly borderline cases that was presented in this litigation. As Chief Judge Newman pointed out in Lebron II, "Amtrak's billboard space in Pennsylvania Station, even if used in the past for ads of a public service nature, has not become a forum for ads of such pointed political content as Lebron's attack on the makers of Coors Beer for promoting 'The Far Right's political agenda.' " 12 F.3d at 394 (Newman, C.J., dissenting).
 
 Conclusion
 
 46
 We reverse the judgment of the district court and remand with the instruction that the district court dismiss Lebron's complaint. As previously noted, see Lebron II, 12 F.3d at 392-393, Lebron is free to pursue his state law claim in state court.
 
 JON O. NEWMAN, Chief Judge, dissenting:
 
 47
 Because I believe that Amtrak, a governmental entity now authoritatively determined to be subject to First Amendment limitations, see Lebron v. National R.R. Passenger Corp., --- U.S. ----, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995), has violated the First Amendment by its rejection of the political advertisement that Michael Lebron contracted to display on a billboard in Penn Station, I respectfully dissent.
 
 
 48
 The Court's dismissal of Lebron's lawsuit rests on two premises, both of which, in my view, are flawed. The first concerns the identification of the forum for purposes of applying public forum analysis. The second concerns the standard for determining whether a governmental actor's policy for rejecting advertisements violates First Amendment requirements.
 
 
 49
 1. The relevant forum. The premise of the Court's identification of the relevant forum is that, in advertising cases, a court should consider the particular billboard on which an applicant wishes to display a message. Proceeding from this premise, the Court narrows its inquiry to "the Spectacular," the large billboard high on the west wall of the rotunda of the upper level of Penn Station. No prior case has taken such a restricted view of the relevant forum, and I think it can be readily demonstrated that the Court's premise is incorrect.
 
 
 50
 The Supreme Court has instructed that the relevant forum is to be determined by "the access sought by the speaker." Cornelius v. NAACP Legal Defense and Educational Fund, Inc., 473 U.S. 788, 801, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). The meaning of that instruction is made clear by the facts of Cornelius. The plaintiff sought access to what the Court called "a particular means of communication," id.--the Combined Federal Campaign, a charity drive aimed at federal employees. The Court ruled that the charity campaign itself was the relevant forum, rather than the entirety of the federal workplace. The cases relied on by Cornelius further illuminate the Court's meaning. In Perry Education Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Court confined its inquiry to a school district's interschool mail system, rather than all parts of school property. Cornelius referred to the mail system as "a particular means of communication." 473 U.S. at 801, 105 S.Ct. at 3448 (emphasis added). In Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), the Court confined its inquiry to advertising space on city-owned buses.
 
 
 51
 All of these cases focus on a means of communication, not the particular location where an advertiser prefers to display its ad. It is unimaginable that in Cornelius the Court would have permitted one political party to solicit funds through the Combined Federal Campaign at one side of the lobby of a federal building while denying another party the opportunity to solicit funds through the Campaign at the other side, or that in Perry the Court would have permitted one group to place a political message in the mail boxes of one school while denying another group a similar right at other schools, or that in Lehman the Court would have permitted political ads on one bus while prohibiting political ads on other buses.
 
 
 52
 The two cases relied on by the majority in the pending appeal, both interestingly and accurately cited with a signal meaning "compare," are also instructive. In Air Line Pilots Assn. v. Dept. of Aviation, 45 F.3d 1144 (7th Cir.1995), the Court focused on diorama display cases throughout an airport, rather than the entirety of the airport. The Court did not limit its analysis to one display case. In Hubbard Broadcasting, Inc. v. Metropolitan Sports Facilities Commission, 797 F.2d 552 (9th Cir.), cert. denied, 479 U.S. 986, 107 S.Ct. 576, 93 L.Ed.2d 579 (1986), the Court focused on all advertising space in a sports arena, rather than the entirety of the arena. The Court did not limit its analysis to one portion of the advertising space.
 
 
 53
 Nevertheless, the Court in the pending case limits its public forum analysis to the one billboard in Penn Station on which Lebron wishes to display his ad--the so-called "Spectacular." There is no question that this billboard is bigger than any other in Penn Station, more visible, and, if one can afford it, more desirable. But public forum analysis cannot be so particularized as to focus on one of several billboards on government property, no matter how preferable that one billboard's size and location may be to an advertiser. The reason can be readily demonstrated. As everyone who has ever walked through Penn Station knows, the Spectacular is high atop the west wall of the station's rotunda, and two small billboards are high atop the north and south walls of the same rotunda. If Amtrak had permitted the Democratic Party to place political ads on either of the two smaller billboards in the rotunda, can it be seriously argued that any court would limit its forum analysis to the one large billboard and permit Amtrak to deny the Republican Party the opportunity to place its political ad on the Spectacular, just because no political ad had previously been on that precise space?
 
 
 54
 The relevant forum must be at least advertising space in the rotunda of Penn Station--the means of communication to which Lebron sought access. Once the forum is defined to have at least this scope, Amtrak's violation of the First Amendment is evident because it has leased advertising space on a kiosk in the rotunda for The Plain Truth, a magazine the Court acknowledges is devoted to "political and social issues." It is clearly unconstitutional for Amtrak to permit its advertising space in the rotunda to be used to convey the message of The Plain Truth and deny space in the same rotunda to the message that Lebron believes conveys the plain truth about the brewers of Coors Beer.
 
 
 55
 2. Amtrak's policy. Even if the relevant forum is the one billboard space known as the Spectacular, the Court's second premise--that the scope and lawfulness of Amtrak's exercise of discretion regarding political ads may be ascertained solely from its past practice--is also unsound. The proper inquiry, the Supreme Court has instructed, focuses not solely on past practice but on "policy and practice," Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449; see Lehman, 418 U.S. at 303, 94 S.Ct. at 2717 ("policies and practices"). If it were the case that the only evidence of Amtrak's approach to political ads was its past practice, an inquiry confined to that practice would be defensible. But the record in this case contains more evidence, and the District Court made findings based on that evidence that are not even arguably clearly erroneous.
 
 
 56
 First, the agreement between Amtrak and Transportation Displays Incorporated (TDI), the leasing agent for billboards in Penn Station, states, "All advertising material, exhibit material, notices and advertisements, and their manner of presentation and design, shall be subject to approval by Amtrak, which may disapprove any such items at its own discretion." Lebron v. National R.R. Passenger Corp., 811 F.Supp. 993, 1002 (S.D.N.Y.1993). It is difficult to imagine a more standardless statement of policy. Second, as the District Court found, neither the key Amtrak official responsible for supervising Amtrak's arrangements with TDI nor any of the executives of TDI knew of any prohibition on political advertising at any of Amtrak's facilities. Id. Third, other key Amtrak officials could not agree on what Amtrak's policy was. One testified that the policy prohibited only those advertisements that were both "political and divisive or objectionable," while another could not say what the policy meant. Id. Fourth, the guidelines of Amtrak's leasing agent, TDI, do not prohibit political advertisements but merely consider them commercial and therefore subject to full rate charge. Id. at 1003.
 
 
 57
 In view of this evidence, the District Court's findings that Amtrak's alleged policy against political ads was unwritten, unclear, and undisseminated provide ample basis for the Court's ultimate conclusion that the policy permitted the unfettered exercise of discretion and created the risk of abuse that the First Amendment prohibits. See Lebron v. Washington Metropolitan Area Transit Authority, 749 F.2d 893, 899 (D.C.Cir.1984).
 
 
 58
 Disregarding the evidence and the District Judge's findings, this Court ascertains Amtrak's policy solely by looking to the past practice of not yet contracting for a political ad on the Spectacular. But where a policy is unwritten, unclear, and undisseminated, the fact that it has not yet been used discriminatorily does not save it from invalidation under the First Amendment. The vice of conferring unfettered discretion on government officials to determine which messages may be conveyed is not avoided by their past pattern of not making a discriminatory decision. The vice inheres in the opportunity for discrimination, and the First Amendment requires that opportunity to be held to an acceptable minimum by a clear and well understood policy that appropriately limits the discretion of the officials who must administer it. See Gentile v. State Bar of Nevada, 501 U.S. 1030, 1051, 111 S.Ct. 2720, 2732, 115 L.Ed.2d 888 (1991) (imprecise standards concerning permissible statements by lawyers); Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 755-59, 108 S.Ct. 2138, 2143-45, 100 L.Ed.2d 771 (1988) (unfettered discretion to permit newspaper dispensing devices on governmental property). As the Supreme Court has observed,
 
 
 59
 The prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement.... The question is not whether discriminatory enforcement occurred here, and we assume it did not, but whether the Rule is so imprecise that discriminatory enforcement is a real possibility."
 
 
 60
 Gentile, 501 U.S. at 1051, 111 S.Ct. at 2732 (citations omitted). In some cases, it might be possible to infer the existence of a policy that passes constitutional muster from a record consisting solely of a pattern of past practice. But in the pending case such a policy cannot be inferred from past practice in the face of substantial evidence that has persuaded a District Judge to make findings that the alleged policy was not understood by the officials responsible for administering it.
 
 
 61
 Wholly apart from the absence of a clear, understandable, and understood policy, Lebron might be correct that, to the extent that the defendant's policy purports to bar political ads, it is a viewpoint-based discrimination that violates the First Amendment. See Air Line Pilots Assn. v. Department of Aviation, 45 F.3d 1144 (7th Cir.1995). As Lebron contends, the defendants are willing to display an ad urging the public to buy Coor's beer but are unwilling to display his ad urging the public not to do so. He makes a substantial argument that viewpoint-based discrimination is occurring when government allows an ad promoting the sale of a product, but purports to prohibit an ad opposing a product because of the views of its manufacturer. Presumably, Amtrak would allow an ad opposing the sale of Coor's beer because of its alcoholic content or for any reason unrelated to the views of its manufacturer. I need not decide whether to accept Lebron's argument since his other positions are well supported on this record.
 
 
 62
 In my view, the District Court's findings, fully supported by the evidence, entitled Lebron to prevail on his claim that Amtrak's refusal to permit display of his ad violated the First Amendment. At a minimum, he is entitled to a declaration that Amtrak has violated the First Amendment, damages (to the extent, if any, not precluded by F.D.I.C. v. Meyer, --- U.S. ----, ---- - ----, 114 S.Ct. 996, 1004-06, 127 L.Ed.2d 308 (1994)), and equitable relief requiring promulgation and dissemination of a clear policy concerning political ads. Since the Court concludes that Amtrak has no liability at all, I need not consider the further issue of whether the equitable relief ought to include a requirement that Lebron's ad be displayed. My statement from the prior appeal, 12 F.3d at 394 (Newman, C.J., dissenting), quoted by the Court out of its context, was directed solely at the issue of the possible scope of relief, not the issue of liability on which the Court today rules.
 
 
 63
 I respectfully dissent.
 
 
 
 *
 Judge Leval became a member of the Second Circuit Court of Appeals on November 8, 1993
 
 
 [1]
 The licensing agreements between Amtrak's predecessor, the Pennsylvania Railroad Company ("PRC"), and TDI provided that the PRC could refuse any advertisement that it deemed " 'unlawful, immoral, improper or offensive to good taste ... or [to] involve political or other views which could result in dissension or [to] involve [PRC] in dissension, complaints or controversy with its patrons or the public.' " Lebron I, 811 F.Supp. at 1001-02 (quoting PRC-TDI licensing agreements) (alterations partially added, emphasis added). However, this language has been superseded by the language quoted in the text of this opinion
 
 
 [2]
 The stated twenty-six years of the Spectacular's existence, and the list of advertisers over that period, is premised upon the record presented on this appeal, which was completed over two years ago
 
 
 [3]
 Lebron contends that because the only government interest in Lehman that garnered the support of a majority of the Court is protecting captive audiences, the case must be read as so limited. However, the Supreme Court has repeatedly reaffirmed a broader reading of Lehman, often specifically citing to the plurality opinion. See, e.g., Krishna, 505 U.S. at ----, 112 S.Ct. at 2705 ("we have upheld a ban on political advertisements in city-operated transit vehicles") (citing Lehman ); Kokinda, 497 U.S. at 726, 110 S.Ct. at 3119 (plurality opinion) ("In Lehman, the plurality concluded that the ban on political advertisements (combined with the allowance of other advertisements) was permissible under [the arbitrary and capricious] standard") (followed by quotation from Lehman, 418 U.S. at 304, 94 S.Ct. at 2717-18) (plurality opinion); Cornelius, 473 U.S. at 806, 105 S.Ct. at 3451 ("a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum") (citing Lehman ); Perry, 460 U.S. at 47, 103 S.Ct. at 956 ("[I]n [Lehman ] (opinion of BLACKMUN, J.), a plurality of the Court concluded that a city transit system's rental of space in its vehicles for commercial advertising did not require it to accept partisan political advertising."); see also Air Line Pilots Ass'n, 45 F.3d at 1153 n. 3 (declining "to limit Lehman's holding to situations involving captive audiences"); Calash, 788 F.2d at 84 (citing Lehman plurality opinion for proposition that "rental of space to commercial advertisers does not require City to accept political advertising on buses"). We therefore see no need to address Amtrak's argument that its policy could be justified on the basis of the captive audience doctrine
 
 
 [4]
 Lebron invokes Lamb's Chapel v. Center Moriches Union Free School District, --- U.S. ----, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), which invalidated a ban on the showing of religiously oriented films in public schools when secularly oriented films on the identical subjects were permitted, to argue that Amtrak's policy violates viewpoint neutrality. Lebron perceives viewpoint discrimination because "[u]nder Amtrak's policy, the Coors Brewing Company could advertise and encourage purchase of its beer, but Lebron's critical treatment of the same subject matter, discouraging purchase of Coor's beer, was rejected because it expressed a 'political' point of view." The argument is plainly specious. The "subject matter" of the Display can hardly be described, with any remote sense of accuracy, as the merits or demerits of Coors Beer. As Lebron himself stated in an affidavit, "I do not seek to sell anything other than ideas with this advertisement."